NASH et al. v. MINER.

(Circuit Court of Appeals, Seventh Circuit. December 7, 1916. Rehearing Denied April 10, 1917.)

No. 2352.

PATENTS ⟪⟫328—VALIDITY AND INFRINGEMENT—DRAFT RIGGING FOR RAILWAY CARS.

The Miner Patent, No. 758,677, the O'Connor patent, No. 829,728, and the Nash patent, No. 858,746, each relating to draft-rigging for railway cars, *held* not infringed, conceding their validity.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by William H. Miner against Charles J. Nash and the Universal Draft Gear Attachment Company. Decree for complainant, and defendants appeal. Reversed.

Louis K. Gillson, of Chicago, Ill., for appellants.
George I. Haight, of Chicago, Ill., for appellee.

Before KOHLSAAT, MACK, and ALSCHULER, Circuit Judges.

KOHLSAAT, Circuit Judge. The matters here in dispute pertain to what is termed a tandem draft-rigging in relation to car couplers. Because of the limited space between draft-sills, within which space draft-rigging must be mounted, it has been found desirable, if not necessary, to provide for the increased strain upon shock-absorbing elements growing out of the tendency to enlarged car equipment, to at least double the efficiency of former devices, by arranging the draft-rigging in tandem rather than abreast of each other. Of necessity the great strain of the heavier train calls for increased strength in all the parts pertaining to the coupling of cars. To keep up with the demands thus growing out of the enlarged car equipment and make reasonable provision for the safety and duration of the coupling devices, all within the same space utilized for that purpose when

the requirements were lighter, has invoked the genius and skill of many inventors—among others, appellee Miner, who seems to have been fertile in attempts to meet the situation. He is unable to say that he has not secured over a hundred patents to that end.

The present suit is based upon three patents, viz.: Claims 17 and 18 of patent No. 758,677, granted to Miner May 3, 1904, for a tandem draft-rigging for railway cars—reading as follows, viz.:

17. In a draft-rigging, the combination with a stop-casting having a lower flanged portion furnished with open slots to receive connecting-bolts, of a removable follower-supporting plate and short connecting-bolts securing the same to the stop-casting, substantially as specified.

18. In a draft-rigging, the combination with a stop-casting having at its middle portion a lower flange provided with a transverse slot to receive a connecting-bolt, of a removable follower-supporting plate and short connecting-bolts securing the same to the stop-castings, substantially as specified.

Claims 2, 4, 5, and 6 of patent No. 829,728, granted to J. F. O'Connor August 28, 1906, for draft-rigging for railway cars, reading as follows, viz.:

2. A railway draft-rigging side-plate or stop-casting, consisting of a cast web of substantially uniform thickness, free from T and other flange-like sections, and having upright convolutions therein forming stops or shoulders for the followers to abut against, substantially as specified.

4. A railway draft-rigging side plate or stop-casting, comprising a cast-metal web of substantially uniform thickness throughout, free from T and other flange-like sections, and having a plurality of upright convolutions therein forming stops or shoulders for the followers to abut against, and provided with further upright convolutions therein forming intermediate stops or shoulders for the followers to abut against to limit the compression of the springs, substantially as specified.

5. In a draft-rigging for railway-cars, the combination with the draw-bar, springs and followers, of side plates or stop-castings each consisting of a cast web of substantially uniform thickness throughout, having integral upright bends or convolutions therein forming upright stop-shoulders, and having also horizontal convolutions forming longitudinal strengthening ribs or flanges, said horizontal convolutions extending between but not across said upright convolutions, substantially as specified.

6. In a railway draft-rigging side-plate or stop-casting, consisting of a cast web of substantially uniform thickness throughout, furnished with a series of upright convolutions therein forming stops or shoulders for the followers to abut against, and furnished with horizontal or longitudinal convolutions therein forming longitudinal strengthening ribs or flanges, said horizontal convolutions extending between but not across said upright convolutions, substantially as specified.

And all the claims of patent No. 858,746, granted to C. J. Nash for draft-rigging for railway cars July 2, 1907. So far as deemed necessary for the purposes of this suit, claim 1 is representative of the invention claimed by the patent. It reads as follows, viz.:

In a railway draft-rigging, the combination with the draw-bar, springs and followers, of side-plates or stop-castings each consisting of a main cast web, having upright open bends therein forming the main stops for the followers to abut against, and having hollow intermediate stops, the double upright walls of which strengthen and stiffen against buffing said main web at the intermediate portions of the stop-casting between the followers or main stops, and at the same time prevent abnormal thickness or body of metal at such intermediate portions, substantially as specified.

All of which patents are owned by Miner.

Claims 17 and 18 aforesaid involve the use of slotted as distinguished from round bolt-holes for receiving the bolts which secure the lower flange of the stop-casting to the so-called follower-plate, to the stop-casting and to the supporting plates. These follower-supporting plates are removable. In order to get at and repair, replace, or adjust the springs, yoke, and other portions of the draft-rigging when necessary, it is important that these supporting plates be removed with as little difficulty as possible. Miner hit upon the slotted bolt-holes and short bolts. These slotted bolt-holes are old—very old in some arts. They seem also to have been used in prior art draw gear for railway cars—see patent to C. H. Starr, No. 382,-840, granted May 15, 1888, where the slotted bolt-hole is used to receive the bolts which hold the draw-spring cage in place; and Hoey patent, No. 593,097, granted November 2, 1897, for draft-beam attachment for railway cars, where the slotted bolt-hole is used for the reception of the stirrup bolts; and the Turnipseed and Williams patent, No. 691,085, for means for attaching draft timbers to the draft-sills of freight cars, where it is used for the reception of bolts $E$ which carry the draft-plates $B$.

It does not appear that slotted bolt-holes had ever been used in the exact combination of claims 17 and 18, although Starr accomplished the same end Miner did, viz., he thereby avoided the necessity of tearing up the car floor. Starr was providing for a single draft-gear. The use of the slotted bolt hole does not seem to have been indispensable to the use of appellee's short bolt, there being ample clearance for the use of round holes. Both the short bolt and the slotted bolt hole are used for the same purpose and in the same way as in the prior art. They furnished a more convenient method for removing and replacing the several elements of the draft-rigging device.

The claims of the O'Connor patent in suit pertain to the side-plate or stop-casting of a railway draft-rigging. This is usually made of malleable iron or other annealed metal. On its web are the stops or shoulders against which the spring followers abut. The side plate of the patent is described in the specification as being of uniform thickness at all points,

"so that the stop-casting as a whole will be entirely free from T or other sections which would result in giving the casting a greater thickness or body of metal at some points than others, with the consequent imperfections, casting strains and defects which have heretofore been incident to the making of side-plates or stop-castings of the old constructions wherein the stops or shoulders from right-angle or T sections with the main plate or web of the casting."

It is the claim of the patent that variations in the thickness of the wall of the convolutions constituting the stops or shoulders are productive of defective castings by reason of the more rapid cooling off of the thinner portions and the tendency of the metal to be injured by one part cooling off after the rest had become cool. O'Connor sought to remedy this without weakening the shoulders. Formerly, it seems, the casting had to be chilled at its thickest points. O'Con-

nor claims to have made this unnecessary by his uniform web. It will be observed that claims 5 and 6 do not specifically mention the elimination of T sections from the castings. No other method of procuring uniform thickness is designated in the specification. Indeed, no casting could accomplish that end and still have the T section. We deem the language of claims 5 and 6 as contemplating freedom from T sections. Nor was the production of convolutions on the web, upright or horizontal, new. Side-plates in which there were raised shoulders and other convolutions, disclosing no T sections, may for the purposes of this suit be conceded to be new. Though Harvey patent, No. 447,323, seems to have gone far toward the accomplishing of this result as early as 1891, and others had claimed to have eliminated T sections in their castings, prior to O'Connor, O'Connor accomplished his purpose by making the stop shoulders, the intermediate stops and the longitudinal strengthening ribs three-sided or hollow.

The idea of O'Connor was to provide a plate which should avoid weaknesses incident to the casting process. He did not undertake to produce new features or functions into draft plates. He disclosed no new relation or operation between the spring followers and the bosses on the cheek plates, nor any new arrangement of the several parts of the draft-gear as such. Except for their tendency to become damaged in the casting process, the side castings theretofore in use were just as usable in draft-gears as those made under the O'Connor patent.

In the view we take of the matter, it is unnecessary to pursue this question further. The Nash patent in suit, the specification says, is related "more particularly to improvements in the construction of the side-plates or stop-castings of the draft-rigging." "Railway draft-rigging stop-castings," the specification proceeds,

"are subjected in practical use to enormous blows, shocks, or strains, and great difficulty is experienced from the draft rigging breaking or giving away at the stop-castings or the shoulders thereon against which the followers abut, and in so designing the side-plate or stop-casting that it will afford the necessary stops or shoulders for the followers to abut against, and at the same time be of a form capable of being so cast as to produce homogeneous and perfect castings, free from casting strains or other defects incident to unequal distribution of metal and varying thicknesses in different parts of the casting, which is ordinarily required to be of considerable length and with a straight flat face to fit against the draft timber or sill of the car, and with the necessary bolt holes or bosses for engagement therewith, and at the same time to possess the necessary strength and stiffness against bending or buckling at the intermediate portions of the casting between the followers of the draft-rigging.

"The object of my invention is to provide a draft-rigging side-plate or stop-casting, by means of which the difficulties or objections heretofore experienced may be practically overcome or obviated.

"My invention consists in the means I employ to practically accomplish this object or result, as herein shown and described and more particularly specified in the claims."

The patent further sets out that:

"Each of the side-plates or stop-castings B is further provided with intermediate stops or shoulders b⁵ to limit the compression of the springs, and the in-

termediate stops $b^5$ are made hollow, or with double upright walls $b^6$ and $b^7$, so that this intermediate portion of the stop-casting between the followers may be adequately strengthened against buffing or other blows, while at the same time the unequal distribution of metal in the casting at this part will be avoided, and the web of the casting maintained of substantial uniform thickness throughout. The inner wall $b^6$ of the hollow intermediate stop $b^5$ is furnished with a bolt-hole or opening $b^8$ through which the bolt $F$ connecting the stop-casting with the draft timber or sill may be inserted, and the back or outer wall $b^7$ of the hollow stop $b^5$ is furnished with a boss or projection $b^9$ to enter a suitable notch or mortise in the draft timber or sill $A$, and thus relieve the connecting bolts $F$ in part from strain. Each of the side-plates or stop-castings $B$ is further provided with an integral upright and flange $b^{10}$ at each end, and with an integral upper guide flange $b^{11}$ to guide the followers, and with a removable lower or bottom guide $G$ which is removably connected to the side-plate or stop-casting by bolts $g$, which fit in slots $b^{12}$ in the bottom lugs $b^{13}$ of the stop-casting at the lower ends of the main stops $b$ $b^1$ $b^2$. Each of the side-plates or stop-castings may also preferably be furnished with depressions $b^{14}$, reducing the thickness of the main web $B^1$ at certain parts, where it can be done without detriment, and thereby lessening the weight of the casting as a whole. The upright end flanges $b^{10}$ of the stop-casting are connected to the front and rear stops respectively by horizontal connecting ribs $b^{15}$.

"By means of the hollow intermediate or spring compression limiting stops, in connection with the open bend or convolution main stops, my new draft-rigging side-plate or stop-casting is adequately stiffened or reinforced against buckling at the intermediate portions thereof between the followers or the main stops, while at the same time the casting is made of a shape such that the metal is evenly distributed and the casting freed from abnormal thicknesses or bodies of metal at different portions of its length, so that in the practical production of the same there is little liability for production of casting strains or warping due to the unequal cooling and contraction at different parts, and defects incident thereto."

The end sought by the patentee was the strengthening of the main stops and the portions of the web of the stop-castings, intermediate the main stops. Nash's original claim 3 called for "a draft-rigging side-plate or stop-casting having main stops and hollow intermediate stops," etc. This claim was disallowed on one of Miner's and on O'Connor's prior patent. Nash then amended by adding the words "with front and back upright walls"—constituting his present claim 3. A further advantage claimed was the limiting of the compression of the springs and serving as a guide thereto laterally. All this was to be accomplished without undue thickness of metal. The peculiar feature of the patent consists in what are termed the double upright walls, consisting of six walls inclosing a hollow cube. The inner wall or face of this stop serves as a guide to the springs, preventing buckling. The stop must under the patent be an inclosed structure, at least substantially. It is appellee's contention that the alleged infringing device, while lacking a face wall next to the springs, yet contains the substance of the Nash patent. With this position we do not agree.

Appellants' device, alleged to infringe the Nash patent, and more particularly the intermediate stop thereof, has five walls only. The web forms the base wall, while the four flanges rising perpendicularly from the web form the four sides. The side wall opposite the base is missing. All of the Nash claims call for the six-sided intermediate stop.

245 F.—23

We find that the Miner patent in suit discloses no invention as to the elements thereof employed in the appellants' device. There is no new use of the slotted bolt-holes. We therefore hold that patent, even if valid, not infringed by appellants. If there be anything new in the O'Connor patent, a question we do not pass on, we find that as to such matter appellants do not infringe the patent. They do not manufacture a draft-rigging draft-plate of uniform thickness, nor do they otherwise trespass upon appellee's monopoly therein. With reference to the Nash patent, as above stated, appellants have no intermediate stops "having front and back upright walls." In view of Nash's assignment to Miner, we do not pass upon the validity of the latter patent.

There seems to be considerable confusion as to just what patents the parts alleged to be infringed are taken from, in view of the vast number of patents in the prior art. We do not deem it important to decide this. After a careful consideration of all these, so far as shown in the record, we are satisfied that, while appellee's device is one which seems to appeal to the railroads as suitable and convenient, those features of it which appellants use are old. No amount of convenience, availability, and popularity can overcome the absence of invention. It is the province of mechanical skill to bring to invention effectiveness, which is second only in importance in the advance of science to invention itself. In the present case one may easily get the two confused. We are clear, however, that for the reasons stated, infringement is not established.

The decree of the District Court is reversed, with direction to dismiss the bill for want of equity.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes