MINER v. T. H. SYMINGTON CO.

(Circuit Court of Appeals, Second Circuit. November 13, 1917.)

No. 13.

1. PATENTS ⊙⇒19—"INVENTION"—INCREASE IN STRENGTH OF DEVICE.
    Mere increase in strength of a mechanical structure is not "invention."
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]
2. PATENTS ⊙⇒328—INFRINGEMENT—DRAFT-RIGGING.
    The Miner patent, No. 668,655, for a draft-rigging for railway cars, construed in view of the prior art, is limited to the precise construction described and shown. As so construed, held not infringed.
3. PATENTS ⊙⇒328—INVENTION—DRAFT-RIGGING.
    The Miner patent, No. 668,656, for a draft-rigging for locomotive tenders, the essential feature of which is the form of the side plates of such rigging, is void for lack of invention in view of the prior art.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. PATENTS ⊚⇒328—INFRINGEMENT—DRAFT-RIGGING.
        The O'Connor patent, No. 829,728, for a draft-rigging for railway cars,
    held not infringed.
5. PATENTS ⊚⇒312(2)—SUIT FOR INFRINGEMENT—EVIDENCE.
        In a suit for infringement in which the only issues tried are those of
    validity and infringement, evidence to show that defendant enticed away
    complainants' workmen, skilled in the making of the patented structures,
    is irrelevant to the issues.

Appeal from the District Court of the United States for the Western
District of New York.

Suit in equity by William H. Miner against the T. H. Symington
Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 238 Fed. 806.

The action is upon three patents: No. 668,655 issued to plaintiff Miner
(Claims 4 and 5). This patent is hereinafter referred to as the first Miner
patent. No. 668,656, also issued to the plaintiff Miner (Claim 8). This patent
is hereinafter referred to as the second Miner patent. These two Miner pat-
ents were applied for and issued on the same days. The first is said to relate
to "draft-rigging for railway cars," and the second to "tandem spring draft-
rigging for locomotive tenders."

"Draft-rigging," or "draft-gear," is a phrase meaning "the whole of the ar-
rangements by which a car is drawn, and which resists concussions."

No. 829,728, issued on the application of O'Connor and owned by plaintiff
(Claims 5, 6, and 7), is also in suit. This patent also is described as for
"draft-rigging for railway cars." It is proven and hereafter assumed that
mechanism of this general type and for the purpose of taking up or minimiz-
ing the effect of the jerks and concussions incidental to the operation of rail-
way cars and tenders (so far as their hauling apparatus is concerned) is old,
and the art crowded.

All of these patents relate to what is known as "tandem draft-rigging," for
which a British patent was issued as early as 1865; and the plaintiff himself
has received or acquired about a hundred patents relating generally to this
subject.

Of the claims in suit under the first Miner patent, the fourth claim is as
follows:

"The combination with the draw-bar, pocket-strap, tandem-arranged springs
and followers, of a pair of flanged steel draft-beams, a pair of stop-castings
secured thereto, and each furnished with three stops and upper guide-flange,
a lower guide-plate for the followers and the draft-rigging to rest upon ex-
tending between said draft-beams and secured thereto by bolts passing through
the lower flanges thereof, the upper guide-flanges of said stop-castings each
tapering from the middle toward both ends to form a fulcrum for the pocket-
strap to swing upon, substantially as specified."

The fifth claim only varies from the fourth in specifying that the lower
guide plate shall have "a central longitudinal channel for the lower member
of the pocket-strap." The single claim of the second Miner patent here in
suit is as follows:

"8. In a draft-rigging, the combination with the draw-bar, pocket-strap,
tandem-arranged springs and followers at both ends of both springs, of a
pair of stop-castings having each three stops for the followers to abut against,
the middle stop at its portions above and below the follower-guides being
deeper than the end stops to form pivots for the draw-bar and pocket-strap
to swing or turn laterally upon, substantially as specified."

Of the O'Connor patent, the fifth claim is as follows:

"In a draft-rigging for railway cars, the combination with the draw-bar,
springs and followers, of side plates or stop-castings each consisting of a cast
web of substantially uniform thickness throughout, having integral upright
bends or convolutions therein forming upright stop-shoulders, and having also

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

horizontal convolutions therein forming longitudinal strengthening ribs or flanges, said horizontal convolutions extending between but not across said upright convolutions, substantially as specified."

The sixth and seventh claims of this patent merely vary the form of statement chosen for the fifth, the latter being stated as a combination, the sixth and seventh describing with particularity the "draft-rigging side plate or stop-casting," which is the substance of O'Connor's invention. He did not and does not pretend to have invented or devised a complete draft-rigging; he states that he deals particularly in "improvements in the construction of the side plates" of such rigging. The lower court found all the above enumerated or. referred to claims valid, and declared infringement of all of them in that the defendant company had manufactured certain draft-rigging apparatus for the New York Central, etc., Railroad upon the order of the latter, and in pursuance of its designs. The defendant took this appeal.

The particular article of manufacture said to infringe all of these claims is a stop-casting made by Symington for the railroad, and pictured below:

DEFENDANT'S STOP–CASTING

The fifth claim, however, of the first Miner patent, is more particularly said to be infringed by defendant's application to the above stop-casting of the supporting plate shown below as passing from one stop-casting to the other and underneath the after end of the pocket-strap:

The stop-casting of Miner's first patent is specifically shown in Figure 6 thereof:

FIGURE 6

James R. Sheffield, of New York City, W. S. Symington, Jr., of Baltimore, Md., and Gilbert P. Ritter, of Washington, D. C., for appellant.

E. W. Hatch, of New York City, Louis Desbecker, of Buffalo, N. Y., and Joseph Harris and Geo. I. Haight, both of Chicago, Ill., for appellee.

George S. Payson, of Chicago, Ill., amicus curiæ.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). It is said that these patents relate to the means for doing a difficult thing, viz.: inserting apparatus strong enough to withstand the increasing demands of railway service into that very contracted space between the sills of a car allowed by the Master Car Builders' Association for the insertion of draft-rigging.

[1] From this premise it is argued that those who furnish such increased strength in draft-rigging without increase of size should be deemed to have displayed invention by (as counsel put it) "the solution of these difficulties." This assertion is erroneous as matter of law. More increase in strength is not "invention" (Planing Machine Co. v. Keith, 101 U. S. 490, 25 L. Ed. 939); and that no change in form, proportions, or degree so as to do the same thing in the same way, though with better results, is invention, has been recently reasserted in Railroad Supply Co. v. Elyria, etc., Co. (May 21, 1917) 244 U. S. 285, 37 Sup. Ct. 502, 61 L. Ed. 1136.

The patentees make no such claim for themselves. Neither of the Miner patents even suggest that the result of the invention claimed is to increase strength or durability without increasing bulk. O'Connor does declare that he wishes to avoid breakage of stop-castings (or side

plates) by producing a web of uniform thickness, and this means that his web is to be a stronger web. He does not claim, however, and no patentee can claim, that his product is entitled to patent protection on account of its strength; he can only patent the means by which he gains strength—or any other desirable quality.

[2] We assume without deciding that, in so far as the claims in suit purport to be for combinations, they set forth true combinations. Examining, therefore, the fourth claim of the first Miner patent as a combination, it is seen to combine all the parts of a draft-rigging, all generally well known to the prior art, and therein presented in many variants. The novelty of the combination and the gist of the invention reside in two elements described thus: (1) "A lower guide-plate for the followers and the draft-rigging to rest upon," and (2) a stop-casting having upper guide-flanges "each tapering from the middle toward both ends to form a fulcrum for the pocket-strap to swing upon."

The stop-casting of the claim can be readily understood by examining Figure 6 (supra), and the guide-plate as claimed is accurately presented by imagining the defendant's supporting plate (supra) extended until it covers and guides all the followers instead of only one of them.

The first question is whether the state of the art entitled Miner to a range of equivalents that would include as infringements devices not within the exact and technical meaning of the words used in the claim. Defendant's stop-casting contains a central flat-faced projection which in order to be an infringement must be found the equivalent of Miner's fulcrum, substantially as described. There is nothing to show that the word "fulcrum" is not used in its ordinary sense, viz. a prop or support for a lever. He shows and describes a true fulcrum, on which the draw-bar and pocket-strap (rigidly connected in Miner's apparatus) truly pivot, exerting an obvious leverage.

A similar rigging normally loosely aligned with the flat face of defendant's middle stop (as is the case in the alleged infringement) might pivot on either the forward or after end or edge of the stop as a fulcrum; but it could never properly be said to pivot on the entire projection.

Something more than a literal reading of the claim is necessary to find infringement, and so "fulcrum" is said to mean any projection upon any part of which a pivoting action may take place. The prior art forbids such construction. It is enough to mention expired patents to the present plaintiff, Nos. 549,207 and 570,038; which plainly disclose a draft-rigging intended to laterally swing upon centrally placed square-faced lugs, not extending the entire height of the stop-casting, but upon which, as the later expired patent states, "the draw-bar and its extension may vibrate laterally to a limited extent." So far as we can discover there was room in the art for exactly the claim made in the patent in suit, i. e., for a combination of parts generally well known, and most of them specifically old, but with a stop-casting truly fulcrumed at the middle stop. But there was not room in the art to claim a fulcrum, and then read fulcrum to cover a wide flat-faced projection, which in its entirety no one would normally call a fulcrum or pivot.

The fifth claim of the first Miner patent presents the additional ques-

.tion whether the supporting plate of the defendant is in substance the channeled guide-plate of the plaintiff. It is undeniable that the function of the defendant's plate, so far as it goes, is exactly that of the plaintiff's. The question is as before, whether prior knowledge leaves it possible to construe a "guide-plate for the followers and the draft-rigging to rest upon, * * * having a central longitudinal channel for the lower member of the pocket-strap" to mean any support for the pocket-strap and contents which even partially performs the guiding function of the described and claimed plate of the plaintiff. There was certainly nothing new in supporting plates channeled or plain. The so-called "spider" of Stark, 587,376, is such a channeled plate, nor does it make any difference that Stark's draft-rigging was a single spring instead of tandem apparatus—both devices must have followers, and for the same reasons. It was successfully urged in the court below that Claim 5 could not be construed to apply only to a guide-plate, which guided all the followers, because such construction would leave Claim 2 (not in suit) identical with it, as Claim 2 specifically calls for a "lower guide-plate extending from the front to the rear follower for the followers and the draft-rigging to rest upon." Cadillac Motor Car Co. v. Austin, 225 Fed. 983, 141 C. C. A. 105. The doctrine is not applicable, because it is not true that the descriptions of the lower guide-plate are the only differences between Claims 2 and 5, but we find (whatever the result upon the compared claims) no difference in meaning between their language on this point; both specifically require a guide-plate that guides all the followers. If the word "followers" in Claim 5 does not mean all followers, it is meaningless.

Let it be assumed that a combination of familiar elements functioning in familiar ways, and new only in the introduction of a supporting guide-plate for all the followers, is valid. It is only valid, however, in its entirety, for supporting plates with channels are both old and simple. Whether it was invention to extend the supporting plate so as to guide all the followers we need not consider; but this claim cannot be read so as to find infringement in a supporting plate that does not guide exactly in the way described and claimed in Miner's patent, without losing whatever validity it possesses.

[3] The second of Miner's patents presents but a single question that we shall consider, viz.: Was it invention to disclose a side casting having a middle stop deeper, i. e., projecting further from its base, than the end stops?

There is here presented an aggravated example of a thing common in patent litigation. This second Miner patent is not for a projecting middle stop, but for a draft-rigging for tenders; its whole object is to provide an apparatus, with certain enlarged parts so as to fill up the space allowed for draft-rigging on tenders, which is much greater than that allowed for cars. Incidentally the eighth claim plainly reads (according to plaintiff) on any stop-casting having "its portions above and below the follower guides deeper than the end stops" if used in what is otherwise any draft-rigging of the prior art.

We doubt whether the disclosure of the patent, owing to clerical errors in drawing, and blind language in specification, supports the claim;

but for purposes of argument we accept the reading of appellee as just stated.

Having made this concession, we nevertheless consider the claim void upon expired patents to Miner, 570,038 and 549,207. Both of these documents show a projecting lug, upon which (as previously pointed out) the patentee declared the drawbar and its rigid extension would vibrate laterally to a limited extent. Miner disclosed this lug in his earlier expired patent and attempted substantially to claim it in his later, and was properly refused by the Patent Office. Yet Claim 8 of the patent in suit shows two lugs (i. e., projections from the middle stop) for the "draw-bar and pocket-strap to swing or turn laterally upon." Of course, the single lug was abandoned to the public when it was not claimed in the first expired patent. The action of the Office as to the second emphasized that abandonment. There was no invention in making the lug double (as the patentee shows it); and we may add it was equally without invention to make the projecting middle stop in the shape chosen by defendant. Nor was the case bettered by substituting one new element, itself showing no invention, in an apparatus otherwise old, and calling it a combination.

[4] Of the O'Connor patent little need be said, since the decision of the Circuit Court of Appeals for the Seventh Circuit in Nash v. Miner, 245 Fed. 349.

We disregard the unhappy phraseology of O'Connor's specification and claims, and look beyond words which seem to demand a patent upon an article showing "bends or convolutions" simply because that shape was chosen. This patentee also propounds a combination, functioning not otherwise than many other draft-riggings, in which the only novel element is a "cast web of substantially uniform thickness throughout," a phrase which is carried through all the claims in suit and is the burden of the specification.

As pointed out in the case cited, even the production of convolutions on the web was not new. In order to have a right to any patent it was necessary to show that the cast web, which looked as if it had been bent and was therefore convoluted in appearance, had some new quality, or arrived at the old result in a new way; for his casting, when completed, functioned like any other casting, and so did the rigging of which it was an element.

If the patentee did this, it was in one way alone; viz. he disclosed that he made his casting without T-sections. Mere inspection of the defendant's casting shows that it is full of T-sections. Therefore it is a different thing from the only new element in O'Connor's alleged combination, and consequently there is no infringement.

[5] Much of the record herein is devoted to an effort to show that the defendant enticed away from the plaintiff's contractors, laborers particularly skilled in the production of stop-castings. This evidence was duly objected to, but successfully justified in the lower court, because it was thought to show "defendant's deliberate appropriation of the plaintiff's rights." We think none of it was relevant. The plaintiff had no rights unless infringement was proven, and infringement did not depend on what particular workmen molded defendant's casting,

but on the nature of the casting after it was produced. As a ground for increased damages in addition to profits, such evidence might have been material, before the master, but it did not tend to prove infringement, which was the only issue tried below. The testimony should have been excluded; but the remarks concerning it made by counsel on both sides in the briefs submitted to us are of a lamentable acrimony, and our disapproval thereof we deem it necessary to note.

The decree below is reversed, with costs in both courts; the mandate will declare that the defendant has not infringed Claims 4 and 5 of the first Miner patent, nor Claims 5, 6 and 7 of the O'Connor patent, and that Claim 8 of the second Miner patent is void for lack of invention.