### GERRARD et al. v. CARY et al.

(District Court, E. D. New York. December 19, 1924.)

**1. Patents ⟨key⟩66—Patent held prior art as to subsequent patent.**

Patent, dated nearly four months prior to subsequent patent to same patentees, was prior art as to such subsequent patent.

**2. Patents ⟨key⟩17—Changes in existing machine to increase speed of production held not invention.**

Changes in existing machine, merely increasing speed of production, *held* not invention, where no new principle was discovered nor new means embodying old principle employed.

**3. Patents ⟨key⟩36—Marked improvements and progressive steps in an art are not in themselves evidences of invention.**

Marked improvements and progressive steps in an art are not in themselves evidences of invention.

**4. Patents ⟨key⟩17—Changes in existing device, not claimed in specifications, cannot be urged as showing invention.**

Changes in existing device, not claimed in specifications, cannot be urged as showing invention.

**5. Patents ⟨key⟩165—Claims must be limited to patentee's contribution to art.**

Claims must be interpreted as limited to patentee's contribution to art, defined in patent as important features of the invention.

**6. Patents ⊂══36—Commercial success of machine held not to prove invention.**

Great commercial success of machine does not prove invention, and could be properly considered only if question of invention was in doubt.

**7. Patents ⊂══26(2)—Combination of old elements to produce old result held not invention.**

Combination of old elements, each acting in its own way to produce an old result, is not invention.

**8. Patents ⊂══328—Patent No. 1,466,334, claims 1, 2, 3, 5, 6, covering machine for straightening, swaging, and cutting wire, held invalid and not infringed.**

Patent No. 1,466,334, claims 1, 2, 3, 5, 6, relating to machine for straightening, swaging, and cutting wire into predetermined lengths, *held* invalid for lack of invention, but, even if valid, not infringed.

**9. Courts ⊂══263—Federal court held without jurisdiction of claim of unfair competition, where defendants and one plaintiff were residents of same state.**

Where defendants and one of plaintiffs were residents of same state, federal court, having found against plaintiffs on issue of infringement of patent, was without jurisdiction as to plaintiff's claim of unfair competition.

**10. Trade-marks and trade-names and unfair competition ⊂══68—Essence of unfair competition is palming off of goods as merchandise of another.**

Essence of unfair competition is palming off of goods as merchandise of another.

**11. Trade-marks and trade-names and unfair competition ⊂══68—Defendants' purchase of same kind of machine used by plaintiffs, and change therein to increase production, held not wrongful.**

Where plaintiffs developed greater speed in production by making improvements in existing machine, defendants committed no wrong in purchasing same kind of machine and developing more speed by making changes therein, especially where plaintiffs had not then applied for patent.

**12. Patents ⊂══260—Purchasers of wire-tying machines held entitled to use any wire thereon that they saw fit.**

Where patented wire-tying machines were sold without restrictions as to wire purchasers might use thereon, purchasers were entitled to use any wire they saw fit.

**13. Trade-marks and trade-names and unfair competition ⊂══93(3)—Similarity in price lists held not to show unfairness.**

Similarity between certain prices on defendants' price lists and plaintiffs' prices *held* not to show unfairness.

In Equity. Suit by Alec J. Gerrard and others against Spencer C. Cary and another. Bill dismissed.

Decree affirmed in 9 F.(2d) 957.

Darby & Darby, of New York City, for plaintiffs.

Cooper, Kerr & Dunham, of New York City (William O. Belt, of Chicago, Ill., and Drury W. Cooper and H. I. Bernhard, both of New York City, of counsel), for defendants.

CAMPBELL, District Judge. This is a suit in equity for the alleged infringement of patent No. 1,466,334, issued by the United States Patent Office to Alec J. Gerrard and Parvin Wright, two of the plaintiffs herein, and also for alleged acts of unfair competition on the part of the defendants.

The plaintiffs amended at the trial by bringing in as a plaintiff Gerrard Wire Tying Machines Company, Inc., a New York corporation, to meet the objection of the defendants that the alleged unfair competition of the defendant, if any, was with that company, and not with the other plaintiffs.

The defendants tender the issues of invalidity and noninfringement, and deny unfair competition.

The action is based on claims 1, 2, 3, 5, and 6 of the patent in suit, which read as follows:

"1. In a wire straightening and swaging machine, the combination of means to straighten a wire; means to receive predetermined lengths of said wire; a power shaft; a cam loose on said shaft; means to connect said cam with said shaft when a predetermined length of wire has entered said receiving means; a lever actuated by said cam; one member of a pair of swaging dies carried by said lever; a stationary anvil carrying another member of said pair of dies co-operating with said first-named die member; and a cutting die member rigid with and spaced from one of said swaging die members, substantially as described.

"2. In a wire straightening and swaging machine, the combination of means for feeding and straightening a predetermined length of wire; a continuously rotating power shaft; a pedestal having a face through which said wire is fed; a lever pivoted between its ends to said face; an anvil provided with one member of a pair of swaging dies rigid with said face, disposed in the path of movement of one of the ends of said lever, and adjacent the path of travel of said wire; another member of said pair of swaging dies carried by said lever end; and a cutting die member moving over the said pedestal face and rigid with one of said swaging die members, substantially as described.

"3. In a wire straightening and swaging machine, the combination of a pedestal having a vertically disposed face through which

a wire may be fed; a wire straightening means carried by said pedestal; a wire feeding means carried by said pedestal; a power shaft and connections carried by said pedestal for operating said wire straightening and wire feeding means; means associated with said pedestal for receiving predetermined lengths of wire after it has been straightened; a lever pivoted on said face of said pedestal having a free end moving in the arc of a circle and carrying cutting and swaging die members spaced from each other; and an anvil located in the path of travel of said swaging die member adjacent the feed wire and carrying a complemental swaging die member adapted to coact with said first-named swaging die member, substantially as described."

"5. In a wire straightening and swaging machine, the combination of means to straighten the wire; means to receive predetermined lengths of said wire; a power shaft; actuating means loose on said shaft; means to connect said actuating means with said shaft when a predetermined length of wire has entered said receiving means; means controlled by said actuating means; one member of a pair of swaging dies carried by said last-named means; a stationary anvil carrying another member of said pair of dies co-operating with said first-named die member; and a cutting die member rigid with and spaced from one of said swaging die members.

"6. In a wire straightening and swaging machine the combination of means to straighten the wire; means to receive predetermined lengths of said wire; a power shaft; actuating means loose on said shaft; means to connect said actuating means with said shaft when a predetermined length of wire has entered said receiving means; die operating means controlled by said actuating means; a swaging die operated by said last-named means; a stationary anvil co-operating with said die operating means; and a cutting member rigid with and spaced from said swaging die and actuated by said die operating means, substantially as described."

The defendants offered in evidence the following patents issued by the United States Patent Office to show the prior state of the art:

No. 231,255, issued to J. M. E. Baackes, dated August 17, 1880, for nail-pointing die, discloses dies for simultaneously severing and pointing nails.

No. 326,240, issued to A. Prestat, dated September 15, 1885, for machine for making shoe nails, discloses dies for flattening the sides of the nail, and a separate and independent cutter or cutters for severing the completed nail from the blank.

No. 326,644, issued to H. Hammond, dated September 22, 1885, for shearing die, discloses dies for swaging and cutting an ax blade.

No. 343,253, issued to D. M. Redmond, dated June 8, 1886, for machine for making umbrella ribs, discloses swaging and cutting dies.

No. 354,603, issued to H. K. Jones, dated December 21, 1886, for metal screw machine, discloses combined cutting and swaging dies; the wire being fed in through ordinary straightening devices.

No. 354,828, issued to H. T. Crepeau, dated December 21, 1886, for wire nail machine, discloses dies which, by a combined swaging and cutting action, cut the wire and swage a point.

No. 375,209, issued to C. C. Small, dated December 20, 1887, for nail making and distributing machine, discloses two rolls, each of which has a point swaging or forming die, feed rolls for feeding the wire thereto, and a cutter to sever the pointed nail from the wire.

No. 393,519, issued to C. D. Rogers, dated November 27, 1888, for die for pointing and cutting off nails, etc., discloses dies which, in severing the blank from the wire, form a cone-shaped point having a compressed surface.

No. 480,032, issued to I. G. Platt, dated August 2, 1892, for method of forming button bars, discloses the use of dies for swaging and cutting.

No. 648,094, issued to R. W. Barker, dated April 24, 1900, for machine for making lingoes, discloses a machine for swaging and cutting wire, and the patentee says (page 1, lines 10–30):

"The object of my invention is to provide an improved machine to facilitate the manufacture of lingoes, to do the work now requiring several persons and machines, and to economize in time, labor, and space in said manufacture. The method in vogue is to run the wire through a machine to straighten it and cut it into lengths sufficient to make two lingoes. Another person puts these lengths in a press to flatten them in the center. They are then passed to another machine and are cut in two at the flattened portion by a die, so as to round the ends of the lingoes. Finally they go to a punching machine, and a hole is there punched through the flattened ends.

"My machine has a feed mechanism attached and performs all the operations necessary to make the completed lingo. It feeds the wire, cuts off to length, flattens the head, punches the hole, and cuts the end round and smooth."

Lingoes are straight wire lengths, swaged at one end, and perforated or slotted, to be connected with the warp threads of a loom to weight and tension them. This patent represents a machine built in 1899 and still in use, of which photographs were offered in evidence. This patent discloses combined cutting and swaging dies, the swaging dies being in advance of the cutting dies, but does not show a straightener, although it clearly contemplates the use of a straightener, and in the photographs the straightener is shown in the form of a hollow tube, which is different in form from the straightener disclosed in the Nilson, Hoefer, and other patents. The combined cutting and swaging die is mounted upon a plunger instead of upon a lever arm, but the plunger is the full equivalent for the lever arm. In this machine the wire is swaged at the end cut, and not spaced from the end, but this is simply a matter of positioning the cutting and swaging dies.

No. 655,720, issued to J. Lanz, dated August 14, 1900, for method of preparing and handling forgings, discloses simultaneous cutting and swaging dies.

No. 670,168, issued to J. Zimmerman & R. Wirth, dated March 19, 1901, for machine for manufacturing can-opening keys, discloses a straightener, punches to perforate the wire in the portion to form the loop, and punches to perforate the wire to form the key slot and the cutting-off punch.

No. 701,375, issued to A. H. Nilson and M. Olson, dated June 3, 1902, for wire straightening and cutting machine, discloses a straightener, feed rolls, cutting die carried by a plunger operated by an eccentric on a shaft. Beyond the cutter, the wire is held in guides, and its forward end engages a stop which acts as a tripper, and is connected with a wire to devices whereby the shaft is rotated to operate the plunger. In this machine the cutter die is carried by a plunger. This machine has been sold commercially, and the defendants several years ago changed the die, on one of these machines, so that it swaged as well as cut the wire, and have operated such machines commercially since that time.

No. 729,864, issued to F. W., A. G., and E. A. Hoefer, dated June 2, 1903, for wire gaging and cutting machine, discloses a machine which receives the wire from a coil, straightens it, feeds it, and automatically cuts it into predetermined lengths. This machine is operated in much the same way as the machine disclosed in the Nilson patent, but in the Hoefer machine the cutter die is carried by a lever arm. The machine made under this patent was the one used by the plaintiffs, and its elements and mode of operation will be referred to later in more detail.

All of these prior art patents had expired before the application for the patent in suit was filed.

[1] The plaintiffs referred to patent No. 1,-453,456, issued by the United States Patent Office to Gerrard and Wright, the patentees of the patent in suit, dated May 1, 1923, for wire deforming and severing machine, as illustrative of a machine which they developed prior to the machine of the patent in suit, and the defendants offered it in evidence. It was dated nearly four months prior to the patent in suit, to which it is prior art. Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564. The object of the invention is described in said patent as follows:

"This invention relates to wire straightening and deforming machines, and has for its object to provide a mechanism of this nature which will be simple in construction, comparatively inexpensive to manufacture, and more efficient in use than those which have been heretofore proposed."

This patent discloses a straightening feed roll, two sets of swaging dies, and cutting dies located between the two sets of swaging dies. The cutting and swaging dies are carried by levers operated by cams on the drive shaft.

The swaging dies are spaced from the cutting dies which are between the swaging dies, and, in operation, the flattened portion on the wire will be spaced accordingly from the ends. One set of swaging dies will flatten one length of wire adjacent to its rear end, the other set of swaging dies will flatten the next length of wire adjacent its forward end, and the cutting dies will cut the wire between the two flattened sections.

The wire which had a flattened section adjacent its forward end being fed forward to the predetermined length, it will then be flattened adjacent its rear end, and you will then have wire lengths with flattened portions corresponding spaces from each end. If one of the swaging dies was removed, the predetermined length of wire would be flattened adjacent to only one end.

From a consideration of the prior art, it appears that swaging and cutting dies for operating on wire, either with or without

straightening, were well known to the art, as was the carrying of the cutter die by a plunger or lever arm.

The plaintiffs did not build an entirely new machine, but purchased a machine for straightening and cutting wire, made, advertised, and sold by Frank L. Wells Company, of Kenosha, Wis., under the said Hoefer patent, No. 729,864; the operation of the machine being described in the patent as follows (page 3, lines 34–86):

"The machine is operated in the following manner: A continuous line of wire $O^8$ extends from a coil on a reel (not shown) through the straightening dies $L^3$ in the revoluble head $L$ between the feeding rolls $F^3$ $G^2$, which drives such line of wire $O^8$ through the cutter-plug $K^5$ and into and along the groove $N'$ in the guide $N$ until the end $O^{10}$ thereof, Fig. 7, strikes the end $O^6$, Fig. 7a, of the gage $O^3$. The gage $O^3$ and its carriage $O$ will be forced along by such moving line of wire $O^8$ in the direction indicated by the arrow in Fig. 7a until motion communicated from such carriage $O$ through the bell crank $Q$ and link $Q^3$ to the detent $P'$ slides the latter upward out of engagement with the cam head $I^7$ of the pin $I^5$ when the spring $I^6$ will force such pin $I^5$ into one of the engaging sockets $I'$ in the female clutch member $I$, which being in constant rotation will turn the male clutch member $I^2$ and its eccentric $I^9$ once around. The single turn of the eccentric $I^9$, just described, acting through the pitman $J^4$ will oscillate the cutter bar $J$ and cause its cutter $K'$ and the cutter plug $K^5$ to sever a segment of wire $X$, which will be released from and pass out of the groove $N'$ in the guide $N$ into the receiving hooks $M^2$ in the manner already described. Instantly after the severance of the segment of wire $X$, which operation simultaneously released the guide closure $N^2$, the detent $P'$, gage carriage $O$, and its gage $O^3$, the spring $V$ will shut the closure $N^2$, Fig. 10, and the spring $R$ will return the gage carriage $O$ and its gage $O^3$ to their original positions, Figs. 1 and 7a, and will also force the detent $P'$ downward against the male clutch member $J^2$, Fig. 7, by which time the latter will have turned a little less than one revolution, whereupon the cam surface $P^2$ thereon will engage the cam head $I^7$ on the pin $I^5$ and therethrough withdraw the latter from engagement with the engaging socket $I'$ in the female clutch member $I$, the male clutch member $I^2$ continuing to turn until the pin $I^5$ strikes the edge of the cam surface $P^2$ of the detent $P'$ and stops the further rotation of such member $I^2$. The continuously moving line of wire $O^8$ will again in due course strike the end $O^6$ of the gage $O^3$, and the series of operations hereinbefore described will be repeated and another segment of wire $X$ will be severed and drop into the receiving hooks $M^2$."

The Wells machine is the machine of the patent in suit, except that the plaintiffs removed the cutting die of that machine and replaced it with a die having a cutting edge and swaging portion, and to this day all the machines the plaintiffs now have are used for both purposes, for straightening and cutting wire without the notch, and also putting the notch in them. This is accomplished by simply changing the dies, and neither set of dies alters the operation of the other.

The patentees in the patent in suit recognized the existence of such machines in the art, in describing the object of the invention, as follows:

"This invention relates to a machine for straightening, swaging, and cutting wires into predetermined lengths, and has for its object to improve the construction of somewhat similar machines that have been heretofore proposed."

The patentees found it necessary to strengthen the machines they purchased, but this they do not claim constituted invention. [2] The commercial output was not satisfactory, so plaintiffs determined to increase the capacity of the machine.

It seems to me that little if any mechanical skill would be required to teach any one that, if the speed of the flywheel was increased, there would be a relative increase of the speed of the straightener, and that, if the machine was to work satisfactorily, provision must be made to relatively increase the speed of the feed rolls and the speed of the operation of the dies.

The testimony shows that six months were spent in bringing about co-ordination, due to the fact that the patentees did not attempt at the beginning to relatively speed up all the operating members, but did speed them up progressively, as with each step the need became apparent, and in such period was also included changes in the dies and their relative positions.

None of these changes are referred to in the patent in suit, or have anything to do with the question of invention, except the positioning of the swaging die at a 45° angle on the pedestal.

All the changes were made simply to increase the speed of the machine, in order to increase production, and there is nothing to show that any of the changes were necessary in order to make the Wells machine work

satisfactorily, if the speed had not been increased. These were improvements but not invention, because no new principle was discovered, nor were new means employed embodying an old principle. Turner v. Lauter Piano Co., 248 F. 930, 161 C. C. A. 48; Crouch v. Roemer, 103 U. S. 797, 26 L. Ed. 426; Walker Mfg. Co. v. Illinois Brass Mfg. Co. (C. C. A.) 265 F. 279; Moline Plow Co. v. Omaha Iron Store Co., 235 F. 519, 149 C. C. A. 65; Miner v. T. H. Symington Co., 247 F. 515, 160 C. C. A. 25; Belsteel Co. v. Lorain Steel Co., 227 F. 240, 142 C. C. A. 30.

[3] Marked improvements and progressive steps in an art are not in themselves evidences of invention. As industry progresses, more skill of the mechanic is expected. New Jersey Zinc Co. v. American Zinc, Lead & Smelt. Co. (D. C.) 276 F. 733; E. A. McMillin Co. v. Androscoggin Pulp Co. (D. C.) 291 F. 134.

[4] Plaintiffs make some point about the changes in the cam, and claim that represented invention. There is no mention of such claim anywhere in the patent in suit, but, if we are to consider it because the shape of the cam is shown in the drawings, it does not seem to me that anything other than mere mechanical skill dictated the change, because, when the patentees speeded up the flywheel, straightener, and feeding rolls, it became necessary to prevent the increased lag of the wire during the swaging and cutting operation, and that was accomplished by simply changing the cam to give a quicker throw of the lever, and thus co-ordinating the speed of all the members. In any event there is no hint in the specifications of the correction of any difficulty by changing the cam to give a quicker throw of the lever, and such change cannot be urged as showing invention. Windle v. Parks & Woolson Mach. Co., 134 F. 381, 67 C. C. A. 363.

It therefore seems clear to me that, if there is any invention in the machine described in the patent in suit, and in view of the prior art it could be but little, it must relate to the dies, and is described in the patent in suit, as follows (page 2, line 100, to page 3, line 10):

"It is an important feature of this invention that the anvil 61 is placed in the arc of the circle traversed by the die member 60 and at a distance of about 45° from a vertical plane passing through the pivot 57, for by so placing this said anvil, the severed wire 41 readily rolls off or falls off the surface of the anvil and drops from the channel 12. Were the said anvil placed in a vertical position, or say 90° from the said vertical plane

above mentioned, the wires would be caught on the surface of said anvil, and would thus clog the machine. On the other hand, if the anvil were placed in a horizontal position, or with its swaging surface in said vertical plane, the swaging action of the die 60 could not act upon the wires as efficiently as is the case when the anvil is placed as illustrated in figure 4. It is a further important feature of the invention that the cutting member of the die 60 moves in contact with the face of the pedestal 1, for such location readily permits the wire to be efficiently sheared or cut in two parts, and it is an additional feature of the invention that the swaging member of the die 60 is removed from the face of the pedestal 1, and the cutting member as shown in figure 7, for such location of said swaging member permits the depressed or deformed portion 75 of the wire to be located a short distance from the end of said wire, thus causing said end to constitute a holding portion or head, as will be readily understood. Further, this location of the swaging member of the die and the forming of said swaging member integral with the cutting member causes the swaging member to strike flat against the anvil 61 simultaneously with the severing action of the cutting member."

The application for this patent, filed June 14, 1922, contained four claims, and in the specifications as filed was contained the statement hereinbefore quoted as to the first important feature. These claims were rejected by the examiner, who said:

"The claims are rejected on Collins, 435,-285, August 26, 1890 (140–140), Nilson et al., 701,375, June 3, 1902 (140–140), Hoefer, 729,864, June 2, 1903 (140–140), or Shuster, 809,636, January 9, 1906 (140–140); no invention being believed to be involved in the substitution of a combined cutting and swaging die for the simple cutter shown in the above references, which show the essential feature of the combination—that is, a one-revolution clutch controlled by the wire stock itself."

After this rejection, which was accepted by the patentees, they amended their application by inserting the description of the further important feature in the words hereinbefore quoted, canceling said rejected claims, and substituting claims 1, 2, 3, 4, and 5 as finally allowed, and the attorney for the patentees, in making such amendments, among other things, said:

"The present amendments bring out the important features of the invention, and they also distinguish in each claim over that of the references; that is, each claim now

calls for a cutting member substantially in the plane of the face of the pedestal *1* and companion swaging die members located in planes outside of the plane of said cutting member. None of the references disclose these features, and it is believed the present claims are allowable."

Subsequently claim 6 was added. Thereafter the patent issued.

In my opinion the relative position of the cutting and swaging dies is a matter of choice and selection, but, if the validity of the patent in suit be sustained, the patentees must be held to have limited their patent by the amendment they made to the specification and claims after rejection, and the explanation thereof by their counsel, and such limitation must apply to all the claims, notwithstanding the fact that only claim 2 of those sued on refers specifically to the cutting die moving in contact with the pedestal face, not because they were estopped by such amendment, but because the claims of said patent in suit, on which this suit is based, if they could be read so as to cover the defendants' structure, would have nothing to distinguish them from the prior art. All that the patentees did was to add swaging dies to a machine that was old and well known, and swaging dies for operating on wire in connection with straightening and cutting means were also well known.

[5] The patentees' contribution to the art was confined to what was defined, in the patent in suit, as the important features of the invention, and the scope of the claims could not be broader than this contribution (Lovell v. Seybold Machine Co., 169 F. 288, 94 C. C. A. 578); therefore the claims must be interpreted as limited to this contribution.

Plaintiffs claim that the structure of the defendants is a copy of that shown in the patent in suit. That the structure of the defendants must, in many of its members, be like that shown in the patent in suit, follows from the fact that both plaintiffs and defendants purchased the Wells machines, made under the Hoefer patent, which were commercial machines in general use in certain lines, and both strengthened them, speeded them up, and added the swaging dies in their respective factories, by their own mechanics; but the defendants had, long before the patentees in the patent in suit filed their application therefor, in their own shop and by their own mechanic, applied swaging dies to the plunger of a Nilson machine which carried the cutting die.

In an attempt to increase the output, the defendants openly purchased from the manufacturer Wells machines, which were faster, and which they knew the plaintiffs were using, and in their own factory their mechanic applied the swaging die to the lever arm which carried the cutting die.

The swaging dies on the defendants' machine are applied in a vertical manner, and not at a 45° angle as on the plaintiffs' machine, and, while the only claim of the patent which introduces this feature is claim 4, which is not sued on, yet it is specifically pointed out in the specifications as an important feature of the invention.

The cutting die on the defendants' machine is not positioned to move in contact with or over the face of the pedestal, and, while only in claim 2 of those sued on is this specific reference found, still this method of positioning the cutting die was by amendment of the specifications of the patent in suit, stated to be a further important feature, and I believe all the claims were limited to this peculiar arrangement.

Plaintiffs offered in evidence a final decree in the action of Alec J. Gerrard and Parvin Wright against the Wire & Steel Products Company, Inc., but, as this was a consent decree, it was not an adjudication after a trial and a consideration of the prior art.

[6] Plaintiffs offered proof of being extensively engaged in business, but that success depended upon the manufacture of other articles than swaged wire, and, even if the commercial success of this particular machine had been great, that would not prove invention, but would be properly considered only if the question of invention was in doubt.

[7] No new combination was produced by the addition of the swaging dies to the Wells machine of the Hoefer patent, but merely an aggregation of old elements, each acting in its own way to produce an old result, and this was not invention. Grinnell Washing Mach. Co. v. Johnson Co., 247 U. S. 426, 38 S. Ct. 547, 62 L. Ed. 1196.

[8] Depending only on the dies used, the machine operating just the same in each instance will produce one of two results. With cutting dies only, it will produce the old result of severing the wire at the predetermined length. Adding the swaging dies, it will produce the additional old result of the flattened section resulting from the use of swaging dies, and thus the machine is not patentable. National Cash Register Co. v. American Cash Register Co., 53 F. 367, 3 C. C. A. 559.

In my opinion, the claims of the patent in

suit, upon which the instant suit is based, are invalid for lack of invention, but, even if they are valid, their scope is strictly limited as hereinbefore described, and the defendants do not infringe.

By amendment on the trial, the Gerrard Wire Tying Machines Company, Inc., was joined as a plaintiff. This company, and not the plaintiffs Gerrard and Wright, conducted the business in which machines of the patent in suit were used and the wire tie products of the patent in suit were marketed. [9] The defendants are residents and citizens of the state of New York, and the plaintiff Gerrard Wire Tying Machines Company, Inc., is a New York corporation; therefore, having found against the plaintiffs on the patent in suit, this court is without jurisdiction as to any claim of unfair competition by said corporation.

[10] If, however, it can be held that the defendants have been in competition with any of the plaintiffs, as to which competition this court has jurisdiction, then it clearly appears that there has been no attempt on the part of the defendants to palm off their goods as the merchandise of the plaintiffs, which is the essence of the wrong in unfair competition; but, on the contrary, the defendants appear to have made great efforts to advertise as their own the goods and merchandise manufactured by them. Armour & Co. v. Louisville Provision Co. (D. C.) 275 F. 92; Auto Acetylene Light Co. v. Prest-O-Lite Co. (C. C. A.) 264 F. 812; Edward Hilker Mop Co. v. United States Mop Co., 191 F. 613, 112 C. C. A. 176; Rathbone, Sard & Co. v. Champion Steel Range Co., 189 F. 30, 110 C. C. A. 596, 37 L. R. A. (N. S.) 258; Charles Broadway Rouss, Inc., v. Winchester Co. (C. C. A.) 300 F. 706.

[11] Whether the plaintiff Gerrard exhibited to the defendant Cary the Wells machine with the swaging dies, or the multiple strand machine, at the plaintiffs' Chicago factory, need not be decided, because the defendant Cary did not seek admission to plaintiff's factory nor gain such admission surreptitiously through fraud, deception, and chicanery, but was there by the invitation of the plaintiff Gerrard, and was shown the machine by him, and not under any pledge of secrecy.

The Wells machine was a machine which was on public sale and well advertised, and I am therefore unable to find that the defendants committed any wrong in trying to ascertain the name of its manufacturer or in openly purchasing such machines and trying to develop more speed on them than they had been able to develop on the Nilson machine, which the defendants did with the aid of their own mechanics, at their own factory, especially in view of the fact that the plaintiffs Gerrard and Wright had not at that time filed any application for a patent on their machine.

[12] The defendant Cary had a patent for swaged wire, No. 1,419,110, dated June 8, 1922, and had a right to make it. The defendants sell the wire openly to the trade for use on any machine to which it is adapted. The purchasers of the Gerrard tying machines purchase them without any restrictions as to the wire they may use on them, and have the right to use any wire they see fit. Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. The wire manufactured by the defendants, which was produced in court on the trial, however, did not fit the Gerrard machines.

[13] The similarity, claimed to exist in the price lists of the plaintiffs and defendants, does exist as to a small number of the many items listed by the plaintiffs, but differs as to others, and I find no unfairness in that.

As to discounts and underselling, the defendants do not appear to have had a monopoly in this form of competition, as the wide range of discounts allowed by the plaintiffs must have made it difficult for the defendants to keep pace with them. As to underselling, the plaintiffs seem to have taken advantage of the fact that, by reason of the multiple strand machine which they operated being capable of producing 3,000 feet of wire per minute, as against 80 to 85 feet on the Wells machine, to have reduced the price to a point where they thought the defendants would not consider it very enjoyable or profitable to meet the same.

I therefore find that the charge that the defendants have engaged in unfair competition with the plaintiffs has not been sustained.

A decree may be entered dismissing the plaintiffs' bill of complaint, with costs.