AMERICAN LAUNDRY MACHINERY MFG. CO. v. TROY LAUNDRY MA-
CHINERY CO., Limited.

(Circuit Court, N. D. New York. July 21, 1909.)

No. 7,193.

1. PATENTS (§ 26*)—INVENTION—COMBINATION OF OLD ELEMENTS.
  If ordinary mechanical skill is adequate to make the selection of ele-
  ments from machines in the prior art and their union or combination in
  a new machine, operating in the old way and accomplishing the same re-
  sult, although it may be an improved result, and no new idea is involved
  in the process, there is no patentable invention, however great the im-
  provement.
  [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig.
  § 26.*]

2. PATENTS (§ 328*)—INVENTION—IRONING-MACHINES.
  The Wendell patent, No. 466,815, for an ironing-machine, is void for
  lack of patentable invention in view of the prior art.
  [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit to restrain alleged infringement of United States
letters patent No. 466,815, dated January 12, 1892, for an ironing-
machine.

See, also, 171 Fed. 878.

Church & Rich (Frederick F. Church, of counsel), for complainant.
Edgar B. Stocking, for defendant.

RAY, District Judge. As the defense possessing merit is that com-
plainant's device or machine, in view of the prior art, fails to disclose
patentable invention, and is therefore void, I shall confine myself to
a description and consideration of the device of complainant and the
patent in suit and to the prior art and its effect on the patent in suit
here. The letters patent in suit were granted to Fred C. Wendell.
January 12, 1892, upon an application filed March 30, 1891, for an
ironing-machine. The proofs show title in the complainant compa-
ny and plain infringement, if the patent be valid.

The specifications say:

"My invention relates to machines for ironing bed and table linen, and has
as its primary object the construction of a simple machine of great capacity
adapted to deliver the fabrics with smooth-finished surfaces and in a thorough-
ly dry condition. Heretofore machines of this character have generally been
constructed with a hollow steam-heated drum combined either with ironing-
rolls acting to confine the fabrics thereon, or with an endless belt partly en-
circling the drum for the same purpose. My invention is directed to the full
and complete utilization of the heating surface of the drum and to the de-
livery of the fabric in a perfectly dry condition at a convenient point. In con-
structing my machine I combine with the heating-drum a series of overlying
co-operating rolls, which press the advancing fabric into intimate contact
with the drum, and also an endless belt, which encircles the drum on the op-
posite side from the rollers, so that after the fabric is acted upon by the rolls
it is carried around the remaining portion of the drum by the belt, being thus
subjected during the secondary part of the operation to a further drying ac-
tion. Inasmuch as the belt serves to carry the fabrics back to that side of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the drum on which they were introduced, and as it is inconvenient to have them delivered into and out of the machine on the same side, I propose to combine with the belt or apron above mentioned a second endless belt, or other suitable carrier, adapted to return the finished fabrics to the rear side of the machine and there deliver them.

"It will be obvious to the skilled mechanic that the details of my construction are not of the essence of my invention, and that they may be modified at will, provided only the drum is combined with the rolls and the aprons in such manner that they act successively to confine the fabrics upon the drum and carry them completely around the same, or nearly so. * * * E represents a basket. table, or other support at the front of the machine, from which the fabrics are delivered between the surface of the drum and the first roll, C. As the drum revolves, the fabric is carried forward therewith under the successive rolls until it arrives at the rear side of the drum. By this time the fabric, which has been subjected to a high heat and to considerable pressure and entirely exposed to permit the escape of the vaporized moisture, is comparatively dry and presents a smooth surface. In passing the last roll at the rear. the fabric continues its downward course and is carried between the apron, D. and the surface of the drum under the latter and up to the front of the machine. In this passage under the drum the fabric is subjected to a further drying influence. so that on delivery at the front it is in a thoroughly dried condition. The delivery of the fabric over the front end of the apron is insured by the presence of a beveled doffer-bar, F, which may, however, be re-placed by any suitable device. * * *

"It will be observed that in my machine I utilize the heated surface of nearly the entire circumference of the drum, so that when a drum of reasonably large size is used the fabrics are quickly and thoroughly ironed and dried in passing once through the machine. It will also be observed that the belt covering the under side of the drum prevents the loss of heat which ordinarily occurs by radiation from uncovered drums. It will be observed that in my machine the ironing-rolls. instead of being geared to the drum. as usual, are driven by frictional contact with the intervening fabric. This is found in practice to be of decided advantage. as the rollers. turning somewhat slower than the drum, act with a frictional effect to retard the advance of the fabric while it is being subjected to the polishing action of the drum. I also find it advantageous to make the rolls of successively increasing diameter, preferably by giving the felt covering an increased thickness, and to adjust them so that they bear successively with increasing pressure on the drum. I find that when thus proportioned and adjusted, and when driven from the drum by the frictional effect of the intervening fabric. instead of being driven by gearing, each roll will turn at slightly higher speed than the one next in advance. The result of this is that the rolls act to draw or stretch out the fabric, keeping the same under tension, so that the drum acts to give them a smoother and better finish than when the rolls are positively driven, as usual."

## Claims 1 to 4, inclusive, are in issue, and read:

"1. In an ironing-machine. the combination of a hollow drum, a series of rolls co-operating with the periphery of the drum on one side, and a traveling apron co-operating with the periphery of the drum on the opposite side and arranged to automatically receive the fabric from the last roll and return it in contact with the drum toward the side of the machine at which it entered, whereby the fabric is automatically subjected, first to the action of the successive ironing-rolls, and thereafter to the heating and drying action of the drum.

"2. In an ironing-machine. the combination of the rotary steam-heated metallic drum, the series of felt-covered rolls acting upon its upper surface, the endless apron surrounding its under surface, and means, substantially as described, for driving said apron.

"3. In combination with the steam-heated metallic drum, the series of overlying rollers covered with felt. the endless apron encircling the lower portion of the drum to return the fabric to the front of the machine. and the second apron or carrier co-operating with the first to return the fabric to and deliver it to the rear of the machine.

"4. In an ironing-machine, in combination with a rotary steam-heated drum and means, substantially as described, for maintaining the fabrics in contact with the drum throughout substantially its entire circumference that they may return to a point near the point of introduction, a secondary carrier to deliver the fabrics after leaving the drum to the rear of the machine."

The first claim calls for the combination, in an ironing-machine, of: (1). A hollow drum; (2) a series of rolls co-operating with the periphery of the drum on one side of such drum; (3) a traveling apron co-operating with the periphery of the drum on the other side thereof so arranged as to automatically receive the fabric from the last roll' and return it in contact with the drum towards the side of the machine at which it entered, whereby the fabric is automatically subjected, first to the action of the successive ironing-rolls, and thereafter to the heating and drying action of the drum. This implies a heated drum, for I think it would be going far afield to surmise that the heating action of the drum is caused by friction. I think that we are to imply a drum that rotates and means for rotating it and means for moving the apron.

Claim 2 calls for: (1) The combination of a rotary steam-heated metallic drum; (2) the series of felt-covered rolls acting upon its upper surface; (3) an endless apron surrounding the under surface of the drum; and (4) means for driving the apron.

Claim 3 calls for: (1) The steam-heated metallic drum; (2) the series of overlying rollers covered with felt; (3) the endless apron encircling the lower portion of the drum to return the fabric to the front of the machine; and, (4) the second apron or carrier co-operating with the first to return the fabric to and leave or deliver it at the rear of the machine.

Claim 4 calls for: (1) The same drum as do claims 2 and 3; (2) in general terms, for both the rollers on the upper side of the drum and the endless apron on the lower side thereof; and (3) the secondary carrier or apron for taking the fabric from the front, after delivery from the metallic drum, to the rear for final discharge or delivery.

The general construction and operation of this machine is as follows: We have a frame for supporting the structure, upon which is mounted, in the usual way, a hollow drum of metal, or covered with metal so as to present a smooth exterior surface. The shaft journals of the drum are hollow so as to permit the introduction of steam into the interior of the drum and "maintain the same in a highly heated condition." On the table of the frame is mounted at each end a strong half circle of iron, which support a series of rolls or rollers of the same length as the drum, and they are so mounted as to revolve by frictional contact with the revolving drum. The mountings of each roller have pressure screws, by means of which the rolls may be pressed with more or less force against the drum. These rollers are covered with felt, or any other suitable material. Thus far this is an exceedingly simple and common device for carrying and pressing a strip of cloth, leather, or other flexible material between two presses, so to speak, and dry same, if moist. As the drum revolves, any such material fed in between the drum and the first roll of the series will

be carried forward, and every part will pass or be carried in succession between the drum and all the rollers. If moist or wet, it will be partially or wholly dried by the heated drum, and the pressure, which will extract more or less of the moisture and the heat, will convert this into steam. As the rolls are at a distance apart, this steam arises between them and passes off into the surrounding atmosphere.

The axis of the drum is a little above the table of the frame, and the rolls begin and end a short distance above the plane of the axis. On the same iron half circle, forming a part of the frame, or connected therewith, and substantially on a line with the table of the frame, and on each side of the drum, are pulleys on which, and on guide pulleys below, is mounted an endless apron of felt, canvas, or other suitable material, which, by means of said mountings and pulleys, is made to cover or come in contact with the surface of the lower half of the drum. There is a simple and suitable driving mechanism for this endless apron. It is made to move with the same speed as the drum. This is simple and is the carrying of an endless apron like a belt around a series of guiding pulleys; one part of the apron being at all times, unless something intervenes, in contact with the lower half of the hot drum. The result is that a garment, like a collar, a cuff, or a piece of cloth, fed in under one of the first-mentioned rollers on one side of the drum, will pass as the drum revolves under all the rollers on the upper side of the drum and between them and the outer surface of the drum, and then between the drum and this endless apron and be further smoothed and dried and to some extent polished. Fed in at one side, the article would be carried around with the drum, retained by the rollers and apron to near the starting point.

It is not desirable to have it discharged or unloaded at the side of the drum where fed in, and hence we have an added apron also carried and guided in part by the same guide pulleys, and wholly by the same driving mechanism. The patentee says of his invention, before speaking of this added apron:

"The foregoing parts constitute a complete and operative machine well adapted to the end in view. In order, however, to return the fabric to the rear and there deliver it, I provide a second endless apron or carrier," etc.

This second apron engages with the first at or near the front and at the point where the articles would ordinarily and naturally be discharged, the drying and ironing process being complete, and continues in engagement carrying the articles between them until the rear of the machine is reached, when at or near the table they are thrown off. The only function of this added apron is to aid in carrying the dried and ironed articles to the rear of the machine. It adds nothing to the efficiency of the machine as an ironing-machine. By properly arranging the pulleys that guide the added apron, the first apron is utilized to aid the second in carrying the articles, after being ironed, from the front of the machine to the rear. So far there is coaction between the ironing-machine proper and this added apron or carrier. I can discover no patentable invention in adding this apron for this purpose. Clearly it was not a mental conception amounting to patentable invention to conceive the idea that an article like a sheet,

a pillow case, a collar, or a cuff, taken between two aprons traveling in the same direction, would be carried to and discharged at the point where the aprons separated. The means devised and employed for doing this are devoid of any patentable merit. They are common. Ordinary mechanical skill was fully adequate to the undertaking.

## Prior Art.

In the prior art we find the patent to J. F. Baldwin, No. 253,661, dated February 14, 1882, showing a frame with a hollow revoluble metal drum thereon, having a polished exterior surface, "adapted," says the patent, "to be heated, preferably by steam, as is usual in such machines." This is the polishing roll and cannot be differentiated from that of the large metal revoluble cylinder of the patent in suit. Baldwin there provides pressure rolls above the upper half of the polishing cylinder mounted in the same frame or extensions of same, "arranged," says Baldwin, "to bear against the periphery of the polishing roll with even pressure throughout its entire length. The rolls are preferably of metal, of the construction hereafter set forth, and covered on their exterior surface with suitable textile material of considerable thickness, so as to render them elastic under pressure." There is suitable means for turning the rolls and connections by means of cogwheels, etc. The articles to be ironed are fed in between the heated cylinder and first roll in front and carried, of course, under pressure between these rolls and the cylinder to the other side of the machine, where they drop or are discharged upon an inclined plane beneath the machine and slide back to the front of the machine. There are suitable means for increasing or diminishing the pressure between the main heated cylinder and these rolls, substantially those of the patent in suit. So far as frame, steam-heated cylinder with polished exterior surface, and rolls are concerned, Wendell is a substantial duplication of Baldwin. There is no patentable difference. There are minor changes and differences, but nothing that changes the elements or mode of operation or result, thus far; but Baldwin does not have either apron, and the articles to be ironed are not carried around the under side of the heated drum in contact therewith. The patent to Hamilton E. Smith, No. 166,648, of August 10. 1875, is in all substantial respects the same.

The patent to Hamilton E. Smith, of August 10, 1875, No. 166,647, for "improvement in ironing apparatus," shows a different arrangement of the pressure rollers; that is, they are placed on the under half of the steam-heated cylinder, and this patent also shows the apron idea for carrying the articles and keeping them in contact with the heated cylinder as they pass between the cylinder and pressure rollers. Neither of these patents utilize substantially the entire exterior surface of the heated drum for drying and polishing the articles to be ironed. They do show that the pressure rollers can be attached so as to operate on either the upper or lower half of such drum, and, of course, on both at the same time. The Smith patent, No. 166,647, also shows that an apron can be used to carry the goods and keep them in contact with the drum on its under side. Whether it shall be used in connection with the pressure rollers or not is merely a mat-

ter of choice. The prior art taught therefore that you may have a hollow metal steam-heated revoluble drum with polished exterior surface, the felt covered and adjustable rollers, all of the same size or some larger than others so as to produce a slipping and increase the polishing, or all of the same size and moving at a different rate of speed from the drum, the apron with guide pulleys for carrying the articles to be ironed to the drum and then forward in contact with the drum, and also means for moving the ironed articles from one side of the machine to the other after being ironed. Take the patent of Smith, No. 166,648, of August 10, 1875, and transfer to it the pressure rolls and apron of the Smith patent of August 10, 1875, No. 166,647, and change the direction of the revolution of one set of pressure rolls, and with slight modifications and changes we would have the patent in suit, especially by dispensing with the pressure rolls of No. 166,647, provided we add the supplementary apron for carrying away the ironed goods. In No. 166,647, Smith says:

"The polishing roller, A, is heated by means of steam, hot air, or other suitable means, which is introduced to the roller through a pipe, a, affixed to one of its gudgeons."

### Also:

"The rollers, B (the pressure rollers), respectively, revolve in journal boxes, E, which are adjustable, so that the rollers can be set toward or from the polishing roller, A, in order to accommodate different thicknesses of cloth, and the said rollers, B, together with auxiliary rollers, F, carry the clothes-supporting apron, C."

### Also:

"The auxiliary or apron rollers, F, are disposed in such a manner that a level portion, H, is imparted to the apron, upon which level portion the clothes to be ironed are spread, and from which the same are carried to the polishing roller. The inner one of the rollers, F, revolves in contact with a guide roller, G, and between these two rollers, F and G, the clothes are taken up from the receiving portion, H, of the apron, and conducted to the polishing roller."

Aprons and apron rollers in an ironing machine for carrying the ironed goods to any desired point after being ironed are shown in the patent to William Jones, No. 104,740, dated June 28, 1870. There the apron is below the hollow heated drum and the pressure rollers and receives the ironed goods and carries them back to the operator below the table. By locating it differently, the goods could have been carried to the back of the machine, or to one end of the table, and by making a double apron they could be carried to the basement or to the garret.

In the Wiles patent of November 11, 1890, No. 440,292, granted prior to the filing of the application for the patent in suit, we have endless aprons for carrying and guiding the goods, and also for delivering same at the desired point. The same law which enables a roller and an apron moving in the same direction to grasp and carry articles between them will enable two aprons sufficiently near together moving in the same direction to grasp between them and carry goods in any desired direction and to any desired point. Such endless aprons by means of cogwheels and guiding pulleys will take and carry the goods first in one direction and then in the opposite direction.

With the prior art before him, the skill of the mechanic was adequate to do all that was accomplished by Wendell. Concede that he has an improved machine, that he utilizes all the periphery of the heating drum, and secures a more thorough drying of the articles, it is obvious that mechanical skill was adequate to apply the apron to the lower half of the drum, as it had been done before, leaving the pressing rollers on the upper half. In the prior art, British patent to Bridson, No. 7,655, of 1838, we have a compound machine for stretching goods and also ironing and polishing them. We have the steam-heated cylinder and pressure rolls at intervals about its entire periphery. Hence we have the entire periphery utilized for drying and polishing and pressing. These rolls have "tighting screws" to give any degree of pressure. True the pressure rolls are hard, not covered with felt, or a like material, but that idea was old when Wendell applied for his patent. Bridson says:

"The pieces of goods under operation being, as before described, just introduced upon the surface of the cylinder or bowl, m, m, and tightly held in its stretched state by the two delivery rollers, 1, 1, it immediately proceeds around the polished periphery of the cylinder, m, m, and is operated upon by bowls or rollers, r, r, placed at suitable distances round the cylinder, and which revolve by contact of their surfaces. These rollers or bowls are set or brought to any degree of pressure by means of the tighting screws, s, s, s, s, and the piece of goods being operated upon becomes mangled, calendered, and finished during the process of drying by the operation of the successive system of bowls upon the cloth as it passes over the cylinder, m, m, until it is delivered in the finished state from the cylinder at t. It will be very evident, to practical persons conversant with these processes as at present conducted, that by passing the cloth around the bowl or cylinder, m, as just described, any degree of finish may be imparted to the goods whilst they are drying upon the surface of the heated bowl or cylinder by varying the degree of pressure of the top or pressing rollers or bowls; and also by making a corresponding variation in their number, or by gearing them so that they shall run at a greater or less degree of speed, as may be found desirable; or the goods may be taken off from the cylinder when any sufficient degree of finish has been imparted to them by this combination of mechanism or apparatus by delivering the piece from the machine by the aid of a pair of delivering rollers, which may be attached to any required part of the machinery, as shown at w, w, providing the cloth is ascertained to be sufficiently dried. It will, of course, be evident that in the construction and arrangement of such a combination of apparatus I am neither limited to the precise dimensions, order, or number of any of the before-mentioned rollers, bowls, or, cylinders, nor to the materials of which they are composed; but as all such operations must be governed by the discretion of the operator, and of the particular demand of finish the goods shall require, such variations in performing the combined process must be left to the judgment of the workman, and any degree of finish hitherto produced by mangles or calenders separately may then be obtained in working the above-described combination and arrangement of apparatus for stretching, mangling, drying, and finishing woven goods and fabrics."

I regard it as immaterial in the construction of complainant's and of defendant's alleged infringing machine whether the drum is positively driven and has gears meshing with the rolls to drive them, or whether the rolls are driven by frictional contact with the drum. The drum itself might be driven by frictional contact with the rolls if they are positively driven. Infringement could not be avoided by such a change as that, and to make such a change would not disclose patentable invention. It would be a mere choice of methods.

Taken as a whole, I do not doubt that this Wendell mangle or iron-ing-machine is as good as any, if not the very best on the market. However, this superiority is not the result of mental conception amounting to patentable invention which found birth with Wendell, or any one man. It is an assemblage and union of different elements from various sources and a combining thereof in an ironing-machine, or mangle, to iron various articles in the old way arriving at the same result, and it may be an improved result; but this is not necessarily patentable invention. Not every improvement is invention. If or-dinary mechanical skill is adequate to make the selection and union, or combination, and no new idea is involved in the process, there is no patentable invention, however great the improvement. See Dodge Coal Storage Co. v. N. Y. C. & H. R. R. Co., 150 Fed. 738–741, 80 C. C. A. 404; Dunbar v. Eastern Elevating Co., 81 Fed. 201, 26 C. C. A. 330; Atlantic Works v. Brady, 107 U. S. 192, 199, 200, 2 Sup. Ct. 225, 27 L. Ed. 438. In this last-cited case Mr. Justice Bradley, giving the opinion of the court, said:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hun-dred different places. To grant to a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above or-dinary mechanical or engineering skill, is distinctly shown, is unjust in prin-ciple, and injurious in its consequences."

But it is said that the defendant has made a machine, an ironing-machine, or mangle, which in all essentials is a duplication, a Chinese copy of complainant's. This is some evidence of utility and even novelty. If I had doubt, I should allow commercial success, adoption by the trade and users, and by defendant to turn the scale; but I have none. I can discover no mental conception amounting to patentable conception. Defendant urges as a reason, or reasons, for copying so closely, that it was found ready to hand, and that, as there is no pat-entable invention disclosed, it had the absolute right to use or copy, and that in putting the various well-known devices together in one ma-chine it was impossible to avoid close imitation; also, that the com-plainant itself, or the prior owners of the patent, have for years sub-stantially conceded that this Wendell patent, now expired, is void for want of patentable invention in view of the prior art. It is contended that the owners of the patent have commenced suits for alleged in-fringement, and that they have never pressed one to a final hearing and determination, although challenged so to do, etc., and that such owner at such times is now a constituent member of defendant com-pany. I find no evidence that estops defendant from now asserting and proving, if it can, the validity of the patent in suit; but it is somewhat suggestive that the validity of the patent has not been ad-judicated in view of the litigation begun. I simply say, however, that I do not think defendant has copied the complainant's structure with any idea that it disclosed patentable invention. The defendant has not conceded the validity of the patent in suit.

There will be a decree dismissing the bill, with costs.