TURNER v. LAUTER PIANO CO. et al.

(Circuit Court of Appeals, Third Circuit.   January 17, 1918.   Rehearing Denied March 7, 1918.)

No. 2285.

1. PATENTS ⬤⇒328—VALIDITY—REENFORCED CONCRETE CONSTRUCTION.
    The Turner patents, No. 985,119, claims 4 and 8, and No. 1,003,384, claims 1, 5, 10, 11, 16, and 17, each for a steel skeleton concrete construction, held void for lack of invention, in view of the prior art.

2. PATENTS ⬤⇒37—"INVENTION"—NEW COMBINATION OF OLD ELEMENTS.
    The union of selected elements from various sources in a patented structure may be an improvement upon anything the art contains; but if, in combining them, no novel idea is developed, there is no patentable invention, however great the improvement may be.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

Appeal from the District Court of the United States for the District of New Jersey; Charles P. Orr, Judge.

Suit in equity by Claude A. P. Turner against the Lauter Piano Company and the American Concrete Steel Company. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 236 Fed. 252.

Frank A. Whiteley, of Minneapolis, Minn., and Willard Eddy, for appellant.

A. C. Paul, of Minneapolis, Minn., and Edward Rector, of Chicago, Ill., for appellees.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This suit for infringement of Letters Patent No. 985,119, issued February 21, 1911, and Letters Patent No. 1,003,384, issued September 12, 1911, to C. A. P. Turner, is here on plaintiff's appeal from a decree of the District Court dismissing the bill on the ground of invalidity of the claims in issue. 236 Fed. 252; 239 Fed. 560.

The two patents sustain the relation of divisional and parent patent. The divisional patent (the earlier to issue), was granted upon an application filed October 19, 1910, as a division of the original application of June 11, 1907; the patent referred to as the parent patent was granted upon the original application. The two patents relate substantially to the same invention, the principal differences being in the scope of their claims. We shall, therefore, consider them together.

[1] The patents in suit are for steel skeleton concrete construction and relate particularly to reenforced concrete girderless floorings. The claims in suit are claims 4 and 8 of the divisional patent (No. 985,119), and claims 1, 5, 10, 11, 16 and 17 of the parent patent (No. 1,003,384), all of which are given in full in the opinion of the District Court. 236 Fed. 252, 254, 255. For the purpose of this discussion, claim 1 of the parent patent may be taken as a typical claim. It is as follows:

"An arrangement of reenforcement for a column-supported flat plate floor of concrete, comprising a plurality of circumferential cantilever members, respectively situated in the upper part of the slab at the columns and projecting therefrom, and reenforcing means extending from member to member in multiple directions through the space between said members, and filling, or substantially filling such space."

The object of the Turner invention is to provide a monolithic single panel floor made of concrete with metal reenforcement, which supports itself and its load on separate columns without beams, girders, or horizontal supports of any kind. The means disclosed by the patents is intended for use in building structures of one or more stories, with reenforced concrete columns and intervening reenforced concrete floors integral therewith. The column reenforcement is vertically continuous; the floor reenforcement originates in the columns, and passing upwardly, bends at the column heads and radiates laterally in the floor slab. Upon or above the head of each column is placed a circular spider of large steel rods raised to what becomes the upper plane of the slab when the concrete is poured in. This spider is anchored at its center in the column and overhangs the column an equal distance in all directions. Because of its position and function, it is termed a cantilever head; because of its shape, it is described as a circumferential cantilever reenforcement. Ordinary reenforcement metal rods of about three-eighths of an inch in diameter are laid from cantilever head to cantilever head in every direction. When the concrete hardens and the plate is formed, reenforcement rods extend from one cantilever head in the upper plane of the plate above a column; as they leave the cantilever, they sag into the lower plane of the plate

between columns; and as they approach the cantilever head of another column, they rise again to the upper plane and pass on as before. Multiple reenforcement is carried on in this way from column to column in all directions, producing between columns a sagging network of metal rods.

As we have said, the thing which the inventor sought to make, is a flat plate floor that will support itself without the aid of beams or girders. In such a floor, extending from and being supported only by four equidistant columns, for example, the effect of a load on the plate midway the supporting columns is to deflect it or press it downwardly and to give it the shape (though imperceptible) of a dish or saucer. Such a circular deflection produces many stresses. These are both radial in outward directions from the columns and circular along lines concentric with the columns. It also develops tensile strains in different planes of the plate: namely, in the upper plane above the columns and in the lower plane between the columns. Such being the natural stresses and strains upon a flat and girderless plate, the patentee claims invention in placing cantilever reenforcement above each column in the upper plane of the plate, and in placing metal rod reenforcement in the lower plane of the plate between columns, and in so shaping the cantilever reenforcement that it will take up the radial and circular strains as they are created. Therefore, the principle which we understand the patentee has endeavored to embody in his means, is the supplying of metal reenforcement at points where tensile strains are expected, and the distribution of reenforcement with an especial regard to the natural tendency of the slab to bend under a load in dish like shape.

The thing which the patentee claims to have achieved by his patented construction, is the making of a thin slab flooring, which will carry as heavy a load as the thick slab flooring of the prior art, at a lesser cost. The trade name which he has given his construction is the Turner Mushroom System.

Reenforced concrete of the modern kind came into use as a building material about fifty years ago. Its growth has been very rapid; it is now used upon an immense scale in a great variety of structures. During the progress of this art, much has been learned concerning the properties of concrete and great advances have been made in methods of using it. Yet, notwithstanding the knowledge acquired and the advances made, the fundamental problems of the art are the same today as they were in the beginning. They have to do with the peculiar characteristics of concrete and with means for meeting them. It is a matter of general knowledge that concrete is strong in resisting compression strains and weak in withstanding tensile strains. Places at which both strains may be expected, while susceptible of accurate mathematical ascertainment, are so well known that they are determined empirically by many engaged in the art. Therefore, as it is easy to ascertain, in one way or another, just where weak places in concrete construction are, the art has produced means with which to strengthen them. This consists in their reenforcement with materials possessing characteristics precisely the opposite of those of concrete. Thus,

metal which possesses tensile strength is placed at weak points in concrete where it is subjected to tensile strains. This is called reenforcement and the product is reenforced concrete.

There is today neither invention nor novelty in merely placing metal reenforcement in concrete at places at which strains come. The very principle of reenforcement, as the word denotes, is to give force to or strengthen the place that is weak by adding something that is strong. Invention in reenforcement is to be found only in discovering a new principle or in employing new means embodying the old principle. Therefore, one striving to find a new principle or to invent a new means of concrete reenforcement under the old principle, enters a well known and widely practiced art and must do something more than care for tensile strains at places where they are known to come. Turner's brief is a learned dissertation on the principles and practices of the art of reenforced concrete construction. It is clear, after reading it, that he appropriates to his invention (rather unconsciously, we believe), many of the principles and some of the practices that have long been in the art. Had he been first to discover and apply them, his claimed invention would have been a great invention. But, in appropriating and applying them in his patented construction, he does not achieve invention unless he causes the old principle to operate in a new way, or the old means to perform new and different functions, resulting in a useful advance of the art.

We make these observations concerning an art of which there is a broad general knowledge, simply to show that Turner was not early in entering it, and that he was not a pioneer in the solution of its problems. Nor was Turner the first to conceive the idea of a beamless or girderless floor. The record discloses girderless reenforced concrete floorings constructed several years before Turner applied for a patent. Most prominent among these is the reenforced girderless and beamless concrete floor of O. W. Norcross, for which Letters Patent No. 698,542 was granted April 29, 1902. As the Norcross patent has been in conflict with the Turner patents in another litigation, and as the validity of the Turner patents must be determined in view of the Norcross patent as a part of the prior art, we find it necessary to discuss this patent at some length.

Stating the purpose of his invention, Norcross says in his specification:

"This invention relates to a flooring for buildings which has been designed with a view of securing the advantages, first, of entirely dispensing with all girders or floor-beams, which have heretofore been regarded as absolutely essential for supporting the floors of buildings; second, to provide a form of flooring which will utilize to best advantage the immense crushing strength of concrete, and, third, to provide a strong inexpensive solid inflexible flooring which can be laid in place by unskilled labor."

To attain these results Norcross designed a flooring consisting of a single panel of reenforced concrete co-extensive with the entire floor space and extending in one unbroken slab or panel from wall to wall of a building, supported at intervals by uprights, posts, or columns. The essential features of the invention, he gives as follows:

"As herein illustrated, a flooring constructed according to my invention consists, essentially, of a panel concrete having *metallic network* encased therein so as *to radiate from the posts* on which the floor rests.

"The metallic network of my flooring is formed by strips of suitable wire-netting. In practice I have used a hog wire fencing, which is a fencing of the same class as ordinary poultry wire fencing, except that the same is made of considerably heavier wire.

"In laying a floor constructed according to my present invention the posts are first erected, and a temporary staging is built up level with the tops of the posts. Strips of wire-netting are then laid closely in place on top of the staging. In practice I have laid this wire-netting *in straight lines from post to post and also crossing diagonally from post to post. A number of layers* of this wire-netting *are preferably employed, said layers being laid together at their crossing points in cob-house fashion, the number of such layers depending on the thickness of the floor, the weights to be supported, and the distance separating the posts.* The concrete is then spread upon or moulded in place on the staging to enclose the metallic network.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"In a completed flooring constructed according to my invention it will be seen that instead of resting or hanging a flooring in place upon beams or girders the flooring rests upon separated posts or other supports and consists of single concrete panel having a wire network enclosed therein in proper position to support the tensile strains, the concrete itself on account of its well known crushing strength having abundant strength for resisting all possible compressions—that is to say, if the forces acting upon a section of flooring supported between two posts be analyzed it will be found that the tendency of the floor section to sag between its supports will cause the lower layers of the flooring to be under tension while the upper layers of the flooring are under compression, these strains being of course greatest at the top and bottom layers, respectively, and diminishing to zero at the neutral axis near the center of the flooring. In addition to this the weight of a section of flooring causes a shearing strain at its line of contact with its supports.

"The principle upon which I have worked in constructing my flooring is to permit concrete alone to resist compressions and to supply a maximum amount of metal at points where the flooring is to be subjected to greatest tensions and shearing strains. In carrying out this principle in some instances—for example, *where there are wide spans between adjacent posts*—I have employed a greater number of layers of wire-netting near the center of the span than at the ends of the span, the distribution of the metal in any one span following substantially the same rules that would be followed in distributing metal in the construction of flat arches, *in all cases the distribution of the metallic network in the flooring being carefully calculated and varied according to the columnation of the building, the thickness of the flooring, and the weights to be sustained.*"

The accompanying diagrams show the principle and mode of operation of the Norcross girderless flooring and the Turner mushroom flooring. To these diagrams must be added the explanation, that the metal reenforcement of Norcross comprises strips of heavy wire netting (not wire rods as the design seems to indicate), while the reenforcement of Turner is made up of strips or a multitude of steel rods (concededly interchangeable equivalents in reenforced concrete work of this character). The further explanation should be made, that the two diagrams were prepared by the defendant for comparison at the hearing, and, that, while the diagram of Turner is a faithful presentation of the patent disclosure, the diagram of Norcross, though it discloses accurately the Norcross principle, is rather closer to Turner in appearance and detail than is the diagram in the Norcross patent.

NORCROSS GIRDERLESS FLOORING.
(Patent No. 698,542)

TURNER MUSHROOM. SYSTEM
(Turner Patents in Suit
No. 985,119 and No. 1,003,384)

As the essential principle of Turner's invention, aside from its cantilever feature, is the arrangement of steel reenforcement criss-cross or crosswise the space between supporting columns, designed to take up strains coming in all directions, it is apparent that its original conception is found in Norcross. If Turner had limited his invention to metal rods or layers of metal rods laid directly and diagonally between the posts or columns in number and position "calculated and varied according to the columnation of the building, the thickness of the flooring, and the weights to be sustained," he clearly would have been anticipated by Norcross. But Turner, while not denying very successfully that he got from Norcross the idea of a crosswise or network reenforcement for the span between supporting columns as an element of his construction, claims that he departed from Norcross in the location of the reenforcement network in the different planes of the slab. He maintains that in Norcross the reenforced network is laid flat on a staging over the heads of the pillars as well as over the spans between them, so that, when the concrete hardens and the staging is removed, the reenforcement will be found everywhere in the lower plane of the slab. And indeed, such would seem to be the reading of the Norcross patent. Just here, Turner claims that he introduced an element not found in Norcross' teaching. This comprises the cantilever head already described, located over the head of the column and situated in what becomes the upper plane of the slab when the concrete is poured in. From this head, steel reenforcement bars radiate in every direction and sag as they extend to similar cantilever heads on other columns. While no such arrangement appears in the Norcross patent, it is in evidence that substantially the same arrangement was practiced before Turner, not only in the art generally, but particularly in concrete girderless floorings. Witnesses testified that in his early work, Norcross, who was a contractor of large experience and engaged in extensive building operations, raised the metal where the belts crossed one another over the tops of the columns so as to bring it above the center of the slab. One witness testified that he assisted Norcross as early as 1899 or 1900 to construct and test a single panel of concrete flooring, which contained strips of wire netting extending along the sides and ends of the rectangle formed by eight outer posts and extending diagonally from these to the ninth post which was located near the center. He said:

"The posts were set up and then there was a floor laid under the whole space the slab was going to occupy, strong enough to hold it. We then laid down from post to post, always, at right angles to each other, pieces—we called it them days 'hog wire', which was a wire fence used to enclose territory to keep hogs; there was no reenforcing material made in them days. Then we laid on top of the floor, diagonally from post to post, the same material *until the whole space* was covered with this wire, *raising the wire over the posts and letting it hang as low as possible in the center of the slab.* After that the whole space was filled to the depth of about eight inches, as I remember, with cinder concrete. Over the posts we were careful to make a little richer mixture of concrete where the greater strain was coming."

It is clear from this, that in girderless concrete floor construction, Turner was not the first to raise the reenforcement over the support-

ing columns. It was done before, because it was the obvious thing to do in view of the known fact that over the supporting column the tensile strain comes in the upper plane of the slab. What Turner did and what his predecessors did was to put the reenforcement at the known point of weakness in the concrete.

When we go to the general art of reenforced concrete construction, which embraces reenforced concrete girders and beams, we find in nearly every instance of a patented invention involving an upright or a column support, the reenforcement placed in the upper plane of the concrete above the column where the tensile strain is bound to come; and in instances where there are two supports with an intervening span, reenforcement is placed in the upper plane above both supports and is permitted to sag off to the lower plane of the intermediate construction. That this practice was almost universal before Turner, is shown by many patents of which the following may be named: Seely (No. 467,141); Hallberg (No. 659,965); Hallberg (No. 659,-966); Hennebique (No. 611,907); Bossyns (No. 751,427); Perrot (No. 783,539); Ellinger (No. 702,093); Ellinger & Kopczynski (No. 729,299); Wight (No. 732,482). The upper plane reenforcement of the prior art, as shown by the few patents cited, contained the principle embodied by Turner in his construction, and named by him the cantilever principle.

From this very brief review of the art, it appears that Turner's construction comprises several elements. One is the criss-cross network arrangement of metal reenforcement; this is old in the art, and as employed by Turner, performs no new function. Another is the elevation of the metal over supporting columns by cantilever heads. Circumferential rings and struts or braces in the enlargement of column heads are old, and are found everywhere in the art. As they are employed by Turner, no new function is developed, unless it be, as he claims, in the circumferential characteristic of the cantilever head which permits reenforcement radially in every direction from which strains come. We are not impressed that this is a novel element involving invention, because, taking Turner's claim to invention even in its broadest scope, he did nothing more with his circumferential cantilever reenforcement than to do radially what the whole art had been doing lineally. While there is much testimony of a highly technical character concerning the particular strain carrying function of a cantilever, circumferential in shape, we do not believe that the circumferential shape creates a new function of the cantilever head involving invention, especially in view of the plaintiff's charge in this case, that the defendant's cantilever, which is rectangular in shape, is an equivalent of his circumferential cantilever and infringes it. The plaintiff's circumferential cantilever and the defendant's rectangular cantilever perform identically the same function in supporting and carrying metal reenforcement in multiple members and directions to the lower plane of intermediate plates, just as the cantilever in Hennebique and in many other constructions performed in single reenforcement of concrete structures. In other words, each

metal reenforcement rod in Turner, running above a column in the upper plane of the plate, then drifting to the lower plane in the intermediate plate, and then ascending to the supper plane as it approaches the next supporting column, performs separately and independently the same function that it performed in many inventions of the prior art. That there are many bars of metal reenforcement in Turner instead of a single bar or a few bars, and that they are placed crosswise instead of straightways, does not change the function which the bar reenforcement performs. Hence the idea of an aggregation of elements, each performing the same function when together that it performs when alone, has arisen and has been a constant difficulty with which Turner has had to contend whenever he has been called upon to sustain his patents.

In Turner v. Moore (D. C.) 193 Fed. 134, and 211 Fed. 466, 128 C. C. A. 138 (C. C. A. 8th), claims 1, 4 and 6 of the Turner divisional patent (No. 985,119) were held invalid as disclosing an aggregation. Claim 8 of that patent, which, with claim 4 is involved in this litigation, is not so different from claim 4 as to call for a different ruling. Both the divisional and parent patents were in litigation in Drum v. Turner (D. C.) 209 Fed. 854, and 219 Fed. 188, 135 C. C. A. 74 (C. C. A. 8th), in which the appellate court held that a construction substantially after the manner pointed out in the specifications of the two patents, was an infringement of claims 1, 3 and 4 of the Norcross patent (No. 698,542). In Turner v. Deere-Webber Bldg. Company (D. C.) 238 Fed. 377, claims 1, 2, 4, 6 and 8 of the divisional patent (No. 985,119) were held void for lack of invention in view of the prior art, and, if valid, not infringed.

[2] The trend of these decisions is that the patents disclose an aggregation, not invention. The plaintiff urges, correctly enough, that these decisions, while persuasive, are not binding on this court, and asks that this court find invention and hold the patents valid. In addition to the purely technical and scientific grounds which we have discussed, he points to the substantial success of the patented construction as evidence of patentable invention, and argues that it should turn the scale of doubt in his favor. But, after a very careful study of the immense record in this case, we find ourselves without serious doubt, certainly without such doubt as may be influenced by the consideration of commercial success of the subject matter of the patents. There doubtless is merit in Turner's system of concrete construction; it may be superior to other systems; but merit, and superiority even, may spring from a conception which does not involve invention. These qualities may come, as we think they do in these patents, from a careful assemblage of different elements from various sources and the clever combining of them. The union of the selected elements may be an improvement upon anything the art contains, but, if, in combining them, no novel idea is developed, there is no patentable invention, however great the improvement may be. American Laundry Machinery Mfg. Co. v. Troy Laundry Machinry Co. (C. C.) 171 Fed. 870; Id., 177 Fed. 1001, 100 C. C. A. 513; Dodge Coal Storage Co. v. N. Y.

C. & H. R. R. Co., 150 Fed. 738, 86 C. C. A. 404; Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438; Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Turner v. Moore, 211 Fed. 466, 469, 128 C. C. A. 138.

While the decisions adverse to Turner's patents are directed more against the divisional than against the parent patent, yet, as the same principles are involved in both, the reasoning of the decisions is applicable to both. · We find ourselves in accord with this reasoning, and hold that the claims of both patents here in issue are invalid for lack of invention in view of the prior art.

This decision makes unnecessary a consideration of the motion to dismiss. The decree below is

Affirmed.