## BABYLON *v.* SCRUTON

[No. 97, September Term, 1957.]

*Decided January 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Stanford Hoff* and *Donald C. Sponseller,* with whom was *Charles Wagaman* on the brief, for the appellant.

*Robert E. Clapp, Jr.,* and *Sherman P. Bowers,* with whom was *Norman I. Broadwater* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Scruton, the appellee, was the superintendent of a contracting firm, who fell to the ground when a concrete slab he was installing as part of the roof of the building under construction broke as he stepped on it. Babylon, the owner of the building and also the manufacturer of the slab, appealed from the judgment entered against him on the verdict of the jury in favor of Scruton. Babylon argues that his

prayer for a directed verdict at the end of the testimony and his motion *n. o. v.* should have been granted.

Babylon is a manufacturer of concrete burial vaults in Carroll County. After planning the project and discussing it with the contractor for several years, he engaged him to build a new plant that was to have a roof of concrete slabs. Babylon in the earlier phase of the project had borrowed forms from another vault plant that had made similar slabs for use as a roof, and manufactured some three hundred slabs which he stored, set up on edge on railroad ties, for several years, awaiting the time he would be ready to use them. Each slab was eight feet long, two feet wide and one inch thick, with a flange on each side, tapering from one and one-half to two and one-half inches. Each slab was reinforced through its middle by a section of ten gauge welded wire netting and most of them were further reinforced by two three-eighths inch solid steel rods, eight feet long, one on each side.

When the time came, in the building operation, to begin the roofing, Scruton asked Babylon how the slabs were made. He says he was told that they were made of one part concrete, one part sand, and one and a half parts stone, and that each was reinforced, along both its sides, by the eight-foot solid steel rods, and in the middle by wire netting. Being satisfied, Scruton began the roofing. The slabs were lifted by a crane to the roof level and piled there. Then one by one they were slid into position, each end resting on a steel beam. Each was inspected by the workmen before it was put in place. After a slab was set, it was necessary to stand on it to clean its edges and put a roofing compound or adhesive on it. Babylon knew this, having watched the work going on. On the third day of the roofing, Scruton, having inspected a slab and found no imperfections, chips or cracks, stepped on it. As soon as he did so, it broke in the middle and threw him to the ground.

An inspection of the two halves of the broken slab showed that its rod reinforcement had not been two solid eight-foot rods but four four-foot rods, two on each side with an overlap in the middle of an inch or two, and that the concrete

had broken jaggedly across the slab just at the point of overlap.

We find there was no error in sending the case to the jury and in denying the motion for judgment *n. o. v.* The law now generally is that a seller or other supplier for a consideration of a chattel may be liable for harm to the person or property of a person who may be expected to be in the vicinity of the chattel's probable use if he has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied. *Prosser, Torts* (2nd ed.) Ch. 17, Sec. 84; 2 *Harper & James, The Law of Torts,* Sec. 28.2; *Restatement, Torts,* Sec. 388. The principle has been recognized and applied in Maryland. *Kaplan v. Stein,* 198 Md. 414, 420. One who supplies a chattel to another to use for the supplier's business purposes "knowing it to be or to be likely to be dangerous for the use for which it is supplied" is subject to liability. *Restatement, Torts,* Sec. 391. So, too, is a manufacturer of a chattel, which, unless carefully or properly made, "he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured * * *". *Restatement, Torts,* Sec. 395. Comment (b) of this section says that it is not necessary that the chattel be intended to affect, preserve or destroy human life. "The purpose which the article, if perfect, is intended to accomplish is immaterial. The important thing is the harm which it is likely to do if it is imperfect." Comment (c) goes on to point out that a manufacturer is required to exercise reasonable care in manufacturing any article which, if carelessly manufactured, is likely to cause more than trivial harm to those who use it. Reasonable care in manufacture includes the adoption and use of a plan or design which, if properly followed, will produce an article safe for the use for which it is produced, the selection and use of proper materials and parts, and the making of such tests during manufacture and after the article is completed as the maker "should recognize as reasonably necessary to secure the production of a safe article * * *".

*Harper and James,* in Sec. 28.3 at page 1540 of the work

cited, in referring to manufacturers of chattels, say the law is that: "His specific obligations may be roughly divided into two categories: the first concerns the design, plan, structure, and specifications for the product; the second concerns miscarriages in the process of manufacture because of which the product is not what was intended—it is 'defective' in some respect. * * * Design or specification quite consciously and deliberately adopted may well lead (e. g., through oversight, miscalculation, or a desire to skimp costs) to a characteristic of the product having so little utility that most people would readily call it a 'defect,' and reasonable care would call for a better product rather than a warning."

In Sec. 28.4 they say: "The maker of an article for sale or use by others must use reasonable care and skill in designing it and in providing specifications for it so that it is reasonably safe for the purposes for which it is intended, and for other uses which are foreseeably probable. And a person who undertakes such manufacturing will be held to the skill of an expert in that business and to an expert's knowledge of the arts, materials, and processes. Thus he must keep reasonably abreast of scientific knowledge and discoveries touching his product and of techniques and devices used by practical men in his trade. He may also be required to make tests to determine the propensities and dangers of his product."

Testing the sufficiency of the evidence, as the rule requires, in the scale that assumes the truth of all evidence and all natural and legitimate inferences it permits, which tend to support the plaintiff's claims, and resolves all conflicts in the evidence in the plaintiff's favor, we see enough to support a jury finding that Babylon, who was both the manufacturer and supplier for his own business purposes of the defective chattel, did not use reasonable care in the making of the slab that broke; that he knew or should have known that it would not, or well might not, be safe for the use for which it was intended and that its defects in construction were a proximate cause of the harm that came to Scruton.

Babylon had never made similar slabs before. He sought no advice as to design or construction. Nevertheless, the slabs, if reinforced with a solid rod on each side, were safe

and adequate. Tests were made on one such slab, and it held seven or eight hundred pounds. The evidence supported two possible findings as to the slab that broke. The jury could have determined that it was the only slab that had been made with two four-foot rods on each side. Before the accident Babylon told Scruton that each slab had two eight-foot rods. After the accident he told an insurance claims representative that some of the slabs had an eight-foot rod on one side and two four-foot rods on the other side because he had been "running short on material" and that slabs so built "basically should have been sufficiently strong enough to carry the weight." When the claims representative asked him about the slab that broke, "he apparently was at a loss to know what had happened, just a mistake." One of Babylon's workmen, who had helped make the slabs and who was produced by him as a witness, testified that "Some of them had their eight-foot rods running clear through, and some of them had maybe two rods on one side and an eight-foot one."

The other conclusion the jury could have reached was that every fifth slab was made like the one that broke. Babylon testified that this was so because he bought twenty-foot reinforcing rods, and after cutting two eight-foot lengths he had a four-foot length left over. Mrs. Scruton heard him say on a visit to her husband in the hospital that "the reason that they put the four pieces of steel into the cement slabs was in order to save on the material. They had made so many mistakes, they did it to save on the material."

Whichever version was accepted by the jury, there was enough evidence for them to find that Babylon, in the language of Sec. 388 of the *Restatement, Torts,* knew, or from facts known to him, should have realized that the chattel was or was "likely to be" dangerous for its intended use, and that those who were to use it would not know this, and that he failed to warn of the danger or of the fact that made danger likely. His mind had dealt with the problem of reinforcement. He had tested a slab with two eight-foot rods. He had tested no other slab. He had believed that a slab with one eight-foot rod and two four-foot rods should be strong enough. He could only have considered the slab with

four short rods a mistake, if the version of there having been only one such slab is accepted. If the version of every fifth slab being made with four short rods was the jury's choice, the record almost compels, and certainly supports, an inference that Babylon was cutting corners in order to save on material and was negligent in making no inquiry or tests as to the adequacy of such design and construction.

Babylon argues that all that has been said may be true but still it was not shown that the use of the four short rods was bad design or that it caused the break. He contends that no expert testified for the plaintiff that this was so and that he produced an expert—a materials testing engineer who had taught the subject in college—who had tested the broken slab and found the concrete sound and of structural quality. He tested only for "cement content and the compressive strength of the concrete". He made no statements as to the tensile strength of the slab or the adequacy of the steel reinforcement. Babylon also produced the vault manufacturer from whom he had borrowed the forms, who had made some two hundred slabs in 1955, and who testified over objection that a slab made like the broken one should, in his opinion, hold a two hundred fifty or three hundred pound man. The jury did not have to believe this testimony, especially since such a slab had broken under less weight. Babylon argues further that the rest of the slabs were installed after the break in the same manner as those put in before, and that this shows that the design and construction of slabs such as the one that broke were not bad or defective. Finally, he urges that there was evidence that slabs were dropped or banged against the ground in the process of lifting them to the roof level and that the break in the slab involved could have been caused by such a dropping or banging.

We think the jury properly could infer that four short rods, two on each side, did not make the slab reasonably safe for its intended use. Babylon proved that the concrete in the broken slab was sound and of structural quality. Indisputably reinforcement was needed to sustain such concrete when used to form a slab eight feet long and one inch thick, to be supported at each end. Not only did Babylon recognize this

but so did Scruton, who would not use the slabs until assured that they were reinforced adequately. Since the concrete was sound, the break had to be due to the inadequate reinforcement. Certainly, the jury who saw the break in the middle of the slab where it would be weakest, even if solid rods had been used, right at the point the rods overlapped but slightly, could deduce, as ordinary, practical men, that the weakness of the reinforcement in the sound concrete, at the point needing the greatest support, caused the break. The jury could have found pertinent the remark of Scruton's helper, an experienced construction worker, who said: "It just broke straight across, and two little irons—I knew they wouldn't have got me on there if I had known them irons was like that, just about an inch" (and explained that he meant overlapped but an inch). As the Court in *Turner v. Lauter Piano Company* (3rd Cir., 1918), 248 F. 930, 932-933, said: "It is a matter of general knowledge that concrete is strong in resisting compression strains and weak in withstanding tensile strains. Places at which both strains may be expected, while susceptible of accurate mathematical ascertainment, are so well known that they are determined empirically by many engaged in the art. * * * Thus, metal which possesses tensile strength is placed at weak points in concrete where it is subjected to tensile strains."

We think it was not essential to have expert testimony on what the jurors, as ordinary men, would be aware of, as a matter of general knowledge. In *Pierce v. C. H. Bidwell Thresher Co.* (Mich.), 116 N. W. 1104, 1106, the defendant was the manufacturer of threshing machines. The plaintiff, a farmer who had bought a thresher from a dealer, was injured by breaking through a decking over the machine into a cylinder. No expert testimony as to the cause of the break was offered, but the construction of the decking and the manner of its break were described. The Court held that the liability of the manufacturer was for the jury, saying: "The question then presented is whether it was necessary to call expert testimony of mechanics to enlighten the jury upon the question of whether driving four-penny nails upward into a cleat would be imminently likely to result in letting a man

down into the cylinder who stepped his weight upon these boards supported in no other manner. We think it altogether clear that this question was at least a question for the jury." In *Leland v. Empire Engineering Company*, 135 Md. 208, 212-213, Chief Judge Boyd said for the Court: "It did not require an expert to prove that a post left unfastened was not sufficiently secured to make it reasonably safe * * *". In *Le Vonas v. Acme Paper Board Co.*, 184 Md. 16, the Court attributed to the unsuccessful plaintiffs a knowledge of the qualities of electricity and its dangers, generally known. In *Locke, Inc. v. Sonnenleiter*, 208 Md. 443, 451, we held it proper for a witness to testify that a table fell over because too much weight was placed near one edge since the witness was merely giving a there pertinent example of the operation of the laws of physics. *Harper and James*, in the work cited, in Sec. 28.12 at 1560, in discussing the requirement that the plaintiff must show that his injury resulted from the condition of the chattel, say that "Injury may result from a break in machinery, and subsequent inspection may reveal a flaw at the point of the break. In these and a host of other like cases the inference of injury from a condition of the product is almost irresistible if the evidence is believed." See also Sec. 28.14; and *Pierce v. Ford Motor Co.* (4th Cir., 1951), 190 F. 2d 910; *Martin v. Food Machinery Corp.* (4th Dist. Cal. App., 1950), 223 P. 2d 293; *Phillips v. Ogle Aluminum Furniture* (4th Dist. Cal. App., 1951), 235 P. 2d 857; *Hilleary v. Bromley* (Ohio), 64 N. E. 2d 832; *Reynolds v. American Foundry & Machine Co.* (Utah), 239 P. 2d 209. See also *Woodworkers Tool Works v. Byrne* (9th Cir., 1951), 191 F. 2d 667, where *res ipsa* was invoked to raise the inference of negligence.

Babylon relies strongly on *Long Company v. State Accident Fund*, 156 Md. 639, but we think that the difference between the facts of that case and those of the case before us make it distinguishable and not controlling. More nearly analogous is *Bethlehem Steel Company v. Variety Co.*, 139 Md. 313.

Babylon's argument that after the break, all of the slabs were installed in the same manner as had been those put in

before the break and that this necessarily included slabs made like the one that broke, has at least two answers. If the jury believed that only one slab was made like the one that broke, the argument falls. If the jury believed that there were other slabs made like the one that broke, they could also have believed, as Babylon testified should have been the case, that those who stood on the slabs kept most of their weight on the steel beams and a smaller part of their weight on the slabs and then only near the end of the slab where it rested on the beam.

Several witnesses testified in support of Baylon's contention that slabs were dropped on or banged against the ground, but only one could say whether this was before or after the accident, and he said that it happened the day before. Scruton testified positively that the slab that broke had been up on the roof level for at least two days and that he inspected it before he stepped on it and there was no evidence of damage. The jury were free to believe Scruton's testimony.

We find no error in the submission of the case to the jury, and the judgment will be affirmed.

*Judgment affirmed, with costs.*